THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GEORGE WATSON, JR., Defendant-Appellant.

Fifth District   No. 77-547

Opinion filed September 21, 1979.

932

Michael J. Rosborough and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, and Michael J. Reagan, law student, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Raymond F. Buckley, Jr., and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KASSERMAN delivered the opinion of the court:

After a jury trial in the circuit court of St. Clair County, defendant, George Watson, Jr., was convicted of attempt murder and armed robbery. He was sentenced to a term of 25 to 75 years imprisonment for the conviction of attempt murder but no sentence was imposed for armed robbery.

On appeal, defendant raises the following issues: (1) whether defendant was denied a fair trial by the State's use, during cross-examination of defendant, of a previously undisclosed inculpatory letter allegedly written by him to the victim; (2) whether defendant was denied a fair trial by the prosecutor's eliciting from him during cross-examination the content of his private conference with his attorney; (3) whether the

jury instructions erroneously permitted a verdict of guilty on the charge of attempt murder without a finding that defendant possessed the requisite intent to kill; and (4) whether defendant's sentence for attempt murder constituted an abuse of discretion by the trial court. In its reply brief, the State also requests that we remand this cause to the circuit court for imposition of sentence on defendant's conviction for armed robbery.

The evidence adduced at defendant's trial established that on March 10, 1977, at approximately 2:30 a.m., Louis Gant arrived at his home in East St. Louis, St. Clair County, after completing his work shift in a nearby factory. As Gant was securing his driveway gate, behind which was parked his other automobile, a 1976 Lincoln Continental Town Car, he was approached by a man brandishing a revolver who demanded Gant's car keys. The armed individual told Gant that he "had to have a car" and then again asked for Gant's car keys as well as his wallet. When Gant complied with the demand, he was told by his accoster that they were "going to have to take a walk" and that "I have to do this to you because you might identify me." After the two men walked approximately two blocks from Gant's home, the individual crossed a ditch and stepped into a dark field where he told Gant to follow him. Gant refused, turned around, and began walking toward his home and told the person that "he seemed like too nice a young man to be doing this." The individual responded to Gant and after walking a few steps, shot Gant in the back, causing him to fall to the ground. While Gant was lying on the ground, the individual walked up to him and fired another shot which struck Gant in the side. The individual then ran back toward Gant's home. After a short while, Gant managed to walk to a neighbor's house, and medical help was summoned. Gant was given emergency surgery and was hospitalized for 21 days as a result of his wounds. After the shooting incident, Gant's 1976 Lincoln was missing.

Two of the defendant's sisters, Sandra Sain and Betty Lavender, testified at defendant's trial on behalf of the State. Sain indicated that the defendant was home on leave from the military during January of 1977 and spent some time at her home. She also testified that defendant returned home for several days in early March so that he could take care of some matters concerning the administration of his parents' estates. Betty Lavender, who lived next door to Louis Gant, stated that defendant was home during the Christmas holidays and also in early March 1977. She related that during defendant's visit, he commented upon Gant's automobile, just as many other persons in the neighborhood had done before him.

Airman 1st Class Richard Parham, called by the State, testified that he was stationed at Westover Air Force Base in Massachusetts with defendant where they worked the same shift. Parham related that in

December 1976, defendant, upon returning to the base from a visit home, told him he was looking for a big car. Defendant subsequently told him he had obtained a car which he went home to pick up in early March 1977. Defendant returned to the base on March 11, 1977, on which date Parham observed a white Lincoln automobile at the front gate of the air base.

Officers Curtis Troy, Allen Goodroe and Robert Latta of the Springfield Massachusetts Police Department testified regarding the circumstances surrounding the arrest of defendant in that city. Troy and Goodroe arrested defendant on March 27, 1977, after observing defendant driving a white Lincoln Continental which bore Illinois license plates and which had been reported stolen. Defendant gave several explanations to the officers concerning his possession of the automobile, including a statement that he had purchased the car from Louis Gant. When confronted with an envelope found in the automobile's trunk, defendant allegedly admitted that the envelope belonged to Gant, a man whom defendant said had been shot and who had asked defendant to hold it for him.

Louis Gant, recalled by the State, identified the envelope found by the police and stated that it had been left in his car by him. Gant also related that when his automobile was returned to him by the Springfield police, it bore a Westover Air Force Base sticker and the keys had been altered.

Defendant denied shooting Gant or taking his car. He explained that his purpose in returning to his home during January and March was to clear up some problems with his parents' estates. He testified that he purchased the automobile on March 9, 1977, for $350 from a man outside a liquor store in East St. Louis. He stated that he knew the car was stolen and that it looked vaguely familiar. Defendant denied telling Parham that he was going home to get a white Lincoln Continental. He testified that he told Parham he intended to get a full-sized automobile because of his size. He also denied telling the police that the envelope found in the car belonged to Gant, and related that he first learned of the theft during a conversation he had with his sister on March 14, 1977.

Defendant recalled that he had seen Gant in January 1977, when Gant's automobile was stuck in the snow outside his home. On cross-examination, he admitted that he had written a letter to Gant in which he mentioned that he had helped Gant remove his car from the snow on that occasion. He testified that no one in the county jail was aware of the incident. When defendant acknowledged that he had mentioned the incident in the letter to Gant, his counsel moved for a mistrial on the grounds that he had not been furnished a copy of the letter prior to trial. In a hearing outside the presence of the jury, the prosecutor explained to

the court that he first received the letter the previous afternoon; and he further stated that until defendant testified about helping Gant with his automobile, he did not know the letter was authentic and had not planned to use it. After hearing arguments by both parties, the court denied defendant's motion and permitted use of the letter for purposes of impeachment and rebuttal.

Defense counsel requested and was granted a 10-minute recess to consult with defendant about the letter before the trial resumed. Following the recess, defendant denied the letter's authenticity on cross-examination although he admitted to writing a similar letter to Gant but without the incriminating passages. Defendant stated that he had mailed his letter to Gant on March 16, 1977; however, he said the letter was returned to him because Gant had moved. He further testified that he did know where the letter was. The prosecutor then asked defendant several questions regarding his earlier 10-minute meeting with his attorney. When asked what was said about the letter during their conference, defendant related that his attorney had remarked, "We're dead." He then repeated his attorney's remark twice and spelled the word "dead" to the court. Throughout this entire exchange, defense counsel made no objection; however, he did allege it to be error in his post-trial motion.

At the close of all the evidence, the jury found defendant guilty of attempt murder and armed robbery. Defendant was subsequently sentenced to a penitentiary term of 25 to 75 years on the attempt murder conviction, but no sentence was imposed by the trial court on defendant's conviction for armed robbery.

Defendant initially contends that the State's failure to comply with the mandatory disclosure requirements of Supreme Court Rule 412(a)(ii) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(a)(ii)) resulted in prejudice to him by denying his right to a fair trial. Specifically, defendant argues that State's use of the letter, allegedly written by him, was error because of the State's failure to disclose its existence to him prior to trial. The State responds that the use of the letter was proper where the prosecutor did not learn of the letter until the defendant testified on direct examination and where defendant and his counsel, after being given the opportunity to examine the letter prior to its use for impeachment, failed to request a continuance for any further investigation.

■■ We initially note that the goal of pretrial discovery is to promote the fact-finding process and to eliminate the tactical advantage of surprise by either side (*People v. Szabo* (1977), 55 Ill. App. 3d 866, 371 N.E.2d 117). In this regard, Supreme Court Rule 412(a)(ii) requires the State to disclose to defendant, upon written motion "any written or recorded statements and the substance of any oral statements made by the accused * * *." (Ill. Rev. Stat. 1975, ch. 110A, par. 412(a)(ii).) This duty of disclosure by

the State is a continuing one, requiring prompt notification of defendant of the discovery of any additional material or information, up to and during trial (Ill. Rev. Stat. 1975, ch. 110A, par. 415(b); *People v. Shegog* (1976), 37 Ill. App. 3d 615, 346 N.E.2d 208). Compliance with Rule 412(a)(ii) is mandatory (*People v. Musgray* (1976), 37 Ill. App. 3d 48, 344 N.E.2d 708) and is only excused if the prosecutor was unaware of the existence of the statement prior to trial and could not have become aware of it in the exercise of due diligence (*People v. Shegog*). The appropriate sanction for failure to comply with discovery rules is not necessarily a mistrial, however, and a court may order compliance, grant a continuance, exclude evidence or enter such order as it deems just under the circumstances Ill. Rev. Stat. 1975, ch. 110A, par. 415(g)(i); *People v. Musgray*.

Defendant cites *People v. Millan* (1977), 47 Ill. App. 3d 296, 361 N.E.2d 823, in support of his argument that the State's failure to immediately notify him of its receipt of the letter prevented him from preparing an adequate defense. In *Millan*, the State first disclosed its intention to call defendant's accomplice, who had earlier pleaded guilty, as a witness against him after trial had commenced. When defendant in *Millan* learned of the State's intention to call his accomplice, he moved for a continuance which prompted the State to withdraw the witness. However, the State later called the witness in rebuttal at which time it is not clear whether defendant requested a continuance again. The *Millan* court ruled that allowing defendant a hurried interview with the witness during trial was not a satisfactory substitute for prompt disclosure, but that defense counsel should have been allowed ample time to prepare for the witness. Relying on *Millan*, defendant argues that the 10-minute recess he was allowed during trial to examine the letter allegedly written by him cannot reasonably be termed an adequate substitute for proper pretrial discovery and, therefore, reversal is required. We disagree.

It is uncontradicted that the State's first awareness of the challenged letter was on the first afternoon of trial and that it was not disclosed to defendant until the following day during the course of his cross-examination. After defendant's motion for a mistrial was denied, his counsel requested and was granted a short recess to discuss the letter with him. At the conclusion of their meeting, defendant returned to the witness stand for further cross-examination with no request being made by himself or his counsel for additional time to confer or investigate the authenticity of the letter. In *People v. Watkins*, (1975), 34 Ill. App. 3d 369, 340 N.E.2d 92, the State learned of an incriminating statement made by the defendant to a State witness when that witness began to testify, at which time defendant initially became aware of the witness' version of their earlier conversation. After objection by defendant, the court

allowed his attorney time to speak with the witness before he testified, and the witness was thereafter permitted to repeat the defendant's statement. On appeal, defendant alleged that the statement was erroneously admitted. The *Watkins* court rejected defendant's contention and concluded that defense counsel was presumably satisfied to proceed with the trial without requesting additional time to investigate the statement inasmuch as the record reflected nothing to the contrary. See also *People v. Pinchott*, (1977), 55 Ill. App. 3d 593, 370 N.E.2d 1289; *People v. Crosby* (1976), 39 Ill. App. 3d 1008, 350 N.E.2d 805.

■■ We find the *Watkins* court's reasoning persuasive and applicable to the instant cause. It is our opinion that defendant and his counsel's failure to request additional time to investigate and discuss the letter indicated a willingness on their part to proceed with the trial. Accordingly, we find no abuse of discretion by the trial court nor any prejudice to defendant by the State's use of the letter, first discovered during trial where defendant made no request for a continuance and was not otherwise forced to proceed without additional time to investigate the letter.

Defendant next contends that his attorney-client privilege was violated when the prosecutor on cross-examination elicited a remark made to him by his attorney during their conference concerning the letter. The State responds the privilege was waived by the defendant's failure to assert it.

As stated earlier herein, when cross-examination of defendant resumed following the short recess, he was asked several questions concerning his conversation with his attorney. At one point defendant stated that his attorney, in referring to the discovery of the letter, remarked, "We're dead." Defendant then twice repeated his attorney's remark when defense counsel and the court related that they did not hear his answer to the prosecutor's question. Throughout this entire exchange, neither defendant nor his counsel objected or made any effort to assert the attorney-client privilege. Defendant now argues, relying on *People v. Knippenberg* (1977), 66 Ill. 2d 276, 362 N.E.2d 681, that there is inherent prejudice in making such objections, even where sustained, because an objection would have implied that defendant and his counsel had something to hide from the jury.

■■ We are of the opinion that *Knippenberg* is not controlling under the facts of the case at bar. In *Knippenberg*, a defense investigator gave the prosecutor a copy of a summary of his interview with defendant in the course of cross-examination. Primarily focusing on the transmission of confidential material to the State without defendant's knowledge or consent, the *Knippenberg* court found no waiver of the attorney-client privilege by defendant notwithstanding his failure to assert it. The defendant in this cause, however, was afforded the opportunity to assert

the privilege at the commencement of his renewed cross-examination but failed to do so. Moreover, several preparatory questions were asked concerning defendant's activities during the recess before the defendant reported his attorney's remark. The decisive factor in determining whether the attorney-client privilege has been waived is whether the privilege was timely asserted by the client for whose protection it exists (*People v. Adam* (1972), 51 Ill. 2d 46, 280 N.E.2d 205, *cert. denied* (1972), 409 U.S. 948, 34 L. Ed. 2d 218, 93 S. Ct. 289). Defendant failed to assert the privilege during the trial; therefore, he waived the privilege as to the disclosed communication.

Defendant next contends that his conviction of attempt murder must be reversed because the court's instructions to the jury permitted them to find him guilty of the offense without finding a specific intent to kill. Defendant argues that *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, and *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888, control and require reversal.

Over objection of defendant, the jury was given Illinois Pattern Jury Instructions, Criminal Nos. 6.05 and 6.07 (1968), (hereinafter cited as IPI Criminal), as the instructions on attempt murder, both of which required a finding of the mental state of intent to commit the crime of murder. The court then defined murder according to IPI Criminal No. 7.01, the instruction stating:

> "A person commits the crime of murder who kills an individual if, in performing the acts which cause the death,
> (1) he intends to kill or do great bodily harm to that individual; or
> (2) he knows that such acts will cause death or great bodily harm to that individual; or
> (3) he knows that such acts create a strong probability of death or great bodily harm to that individual." (People's Instruction No. 10.)

Our supreme court considered the propriety of a similar instruction in *People v. Harris*, and held: "An instruction must make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown." (72 Ill. 2d 16, 27, 377 N.E.2d 28, 33.) Although three justices dissented in part in *Harris*, all agreed that the words "or do great bodily harm" must be excised from the definition of murder and from the instruction if the instruction is framed under section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)), as was the instruction in this case.

In *People v. Roberts* (1979), 75 Ill. 2d 1, the supreme court held that an instruction similar to the one given in *Harris* and in the instant case was erroneous but held that the defendant waived any error by failing to raise the objection in the trial court. Here, the defendant objected to the court

giving the instruction defining murder (People's Instruction No. 10) at the conference on jury instructions and in his post-trial motion; however, defendant's objection to the instruction was that "all of the testimony in this case, the only evidence that would bear, would be that whoever did the shooting intended to kill him. That is what he intended to do, not great bodily harm." By thus limiting his objection, defendant in effect stipulated that whoever shot the victim intended to kill him. We agree. The defendant, while armed with a revolver, confronted Gant outside his own home and demanded and obtained his automobile keys. He then stated to Gant that, "I have to do this to you because you might identify me" after which he walked his victim down the street to an empty field. When Gant refused to go farther and turned to go home, defendant shot him in the back and, as he lay face down in the street, shot him again. The testimony was uncontradicted except as to the identity of the assailant. The evidence made it impossible for the defendant to argue and for the jury to find that the individual who shot Gant intended to do anything other than to kill him. This conclusion is in conformity with the rationale of the decision of this court in *People v. Lewis* (1979), 71 Ill. App. 3d 214, 389 N.E.2d 665, in which it was held that it was not error for the trial court to fail to instruct the jury as to the definition of murder, including that portion of the instruction which defines murder as encompassing the performance of the acts complained of with other than the intent to kill. Defendant had contended in *Lewis* that had such instruction been given, defendant may have been acquitted on the ground that he did not intend to kill his victim. In affirming defendant's conviction, this court held that there was nothing in the record as much as suggesting that anything less than the intent to kill would satisfy the State's burden. The same is true in the case at bar.

Under the evidence introduced at trial, the jury was justified in believing that defendant set out to eliminate the only witness to a crime that he had committed; and, under the authority of *Roberts*, we find that any error in giving People's Instruction No. 10 was waived by defendant's limited objection to its being given.

Defendant next contends the sentence from 25 to 75 years imprisonment for attempt murder is excessive. The imposition of sentence is a function of the trial court, and a reviewing court will not disturb the sentence imposed unless it constitutes a clear abuse of discretion. *People v. Perruquet* (1977) 68 Ill. 2d 149, 368 N.E.2d 882.

Here the court observed that it was not due to the defendant that the victim survived. As the victim lay face down in the street, the defendant shot him again. The fact that the victim managed to survive an apparently mortal wound is the only factor which prevented defendant from committing murder. The defendant's conduct was premeditated as

evidenced by the fact that three months before the offense he was contemplating the theft of Gant's automobile. It cannot be argued that his conduct was committed on impulse or in the heat of passion. The court considered defendant's prior good record; however, rehabilitation is discounted in view of the nature of the offense. The presentence report indicates that defendant was not driven by any motive other than the desire to possess defendant's white Lincoln automobile; therefore, his prior good record serves only to emphasize the senselessness of the crime. The sentence of 25 to 75 years imprisonment does not constitute a clear abuse of discretion, as referred to in *Perruquet*, and must therefore be affirmed.

■■ Finally, the State urges that we remand this cause to the circuit court for imposition of sentence on defendant's conviction for armed robbery, the court's having failed to do so at the time sentence was imposed on defendant's attempt murder conviction. The State correctly asserts that until sentence is imposed the judgment remains incomplete. (*People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540; *People v. Dean* (1978), 61 Ill. App. 3d 612, 378 N.E.2d 248.) We therefore remand this cause to the circuit court for imposition of sentence on defendant's conviction of armed robbery.

For the reasons stated, we affirm the defendant's conviction and sentence for attempt murder and we affirm the defendant's conviction for armed robbery and remand the cause for imposition of sentence thereon.

Affirmed in part; affirmed and remanded in part.

G. MORAN and KARNS, JJ., concur.