THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD F. QUINLAN, JR., Defendant-Appellant.

First District (4th Division)   No. 78-2001

Opinion filed June 26, 1980.

Ralph Ruebner and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Robert J. Clifford, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial the defendant, Richard Quinlan, Jr., was convicted of rape, two counts of aggravated battery, and burglary. He was sentenced on the rape conviction to a term of four to 12 years in the Department of Corrections. The court also revoked a previous probation order and sentenced defendant to a concurrent term of one year to one year and a day. No sentences were entered on the other convictions.

On appeal defendant contends: (1) the trial court erred in preventing defendant from eliciting at the motion-to-suppress hearing testimony concerning the victim's prior description of her attacker; (2) the State was erroneously permitted to introduce hearsay testimony concerning the victim's account of the incident to the police; (3) the State improperly suggested that defendant be held accountable for failing to secure the testimony of a witness; (4) the trial court erred in permitting the introduction into evidence of a blood-stained sheet found in the victim's apartment; (5) the evidence was insufficient to prove the penetration element of the rape charge; (6) defendant was improperly convicted of two counts of aggravated battery which were based on commission of the same physical act; and (7) the evidence was insufficient to establish that defendant caused the victim grave bodily harm, a necessary element of one of the aggravated battery counts.

We vacate defendant's conviction for aggravated battery based on infliction of great bodily harm. We affirm the remaining convictions but remand for sentencing on the remaining aggravated battery conviction and the burglary conviction. .

At trial Officer John Senyshyn of the Palatine police department testified that on July 16, 1977, at about 3:50 a.m. he was dispatched to the home of the complainant, Karen D. She met him at the door, wrapped in a bedsheet, visibly shaking, and appearing extremely upset. Senyshyn observed two hairline cuts on her back. Over defense objection Senyshyn was permitted to testify that Karen then told him of being raped. Karen related that she had been sleeping on the living room couch, but got up to investigate a noise from the kitchen. A man entered a window there, holding a knife-type tool. He placed it against her throat, forcing her into the living room where he cut off her pajamas and underwear. He then forced her into the bedroom, made her lie down and had intercourse with her. In the bedroom Senyshyn observed a dark red-brown stain on the bedsheet. Karen told him that the man was wearing a dark knit watch cap and a red and white bandanna over the bridge of his nose.

The stained sheet found in Karen's bedroom was examined by Sally Dillon, assistant laboratory supervisor at the Department of Law Enforcement, Bureau of Scientific Services, in Joliet. She testified that the stain was blood, but could not determine how old it was or whether it was human or animal.

Buffalo Grove police officer Robert Manson arrested the defendant the day of the attack on Karen. In defendant's vehicle he observed a knife-like object next to the defendant's right leg and a red and white bandanna on the right front passenger seat. Defendant told Manson he was on his way to work for a boat manufacturer and used the tool in his work.

Assistant State's Attorney Irving Miller testified that he questioned the defendant that same day. Defendant first said that he paid a social visit to Karen's home the day before, leaving at 9 p.m. to go home and sleep. Miller informed him that at 3:30 or 4 a.m. a police officer visited defendant's home and found the hood of his car was hot, indicating the car had just been used. Defendant then admitted that he had gone back and driven by Karen's house, but had not left his car. Miller next informed him that a footprint matching his was found under Karen's kitchen window. Defendant admitted he had left his car and looked in the window, but stated he then went home. At this juncture Miller obtained defendant's consent to search his home and car. A navy-blue stocking cap was found in the car and a knife and several articles of clothing were found in his bedroom. Defendant admitted having the knife in his possession when he went up to Karen's window. He was also shown a red and white bandanna which he admitted wearing earlier that evening. Defendant again changed his story according to Miller, stating that he entered Karen's apartment through the kitchen window, saw nobody, and returned home. When Miller informed him he was being charged with rape defendant said he wanted to tell the truth. He admitted entering the apartment wearing the cap and bandanna and carrying the knife. Karen came into the kitchen, screamed, and defendant grabbed her. He told Miller that he was just playing a game at that time. He dragged Karen into the living room where he cut her nightgown off. He again told Miller that he was still playing with Karen then and she was playing too, although she was also crying. Defendant cut Karen around her nipple and on her back. He then took her into the bedroom and put her on the bed. He attempted to pull his penis out of his pants but ejaculated in his pants. When he removed his penis he did not have an erection but still tried to put his penis into Karen's vagina. He was not sure if he succeeded in doing so.

Karen testified that she first met the defendant in early 1976 at a Palatine tavern where she worked. She never dated him then and did not see him again until July 1977 at the Waukegan Speedway. Defendant,

accompanied by a friend named Nels, gave her a ride home. The car overheated several times, ultimately forcing them to stop at a forest preserve. When the car would not start they both fell asleep until morning. Nels was asleep or passed out in the back seat this entire time. The next morning when they reached Karen's house she told defendant if he was locked out of his home he could return to her house. He did so and slept on her couch. On July 14, 1977, he came to the house and they talked for several hours on her front porch. Defendant discussed a rape seminar he was attending, commenting that professionals would use a razor blade because it could not be traced. He also commented that her window locks were flimsy. Defendant returned the next evening on July 15 and spoke with Karen for some time, leaving at 9 p.m. Later that evening Karen went to sleep on her living room couch. A rattling noise woke her at 3 a.m. She walked to the kitchen and observed a figure at the window. Karen, who is near-sighted, was not wearing her contact lenses and could not see well without them. She screamed and the person jumped inside and held a knife to her throat, asking if she wished to die. She stopped screaming and he forced her onto the couch. At this point the man began asking her a lot of questions and she recognized his voice to be that of the defendant. Defendant cut off her pajamas, cutting her back in the process. He also cut her breast. (Karen was not asked whether these cuts bled but she did testify that they were severe enough that the hospital advised her stitches might be needed if they did not heal without them.) Defendant then pushed Karen into the bedroom where he inserted his penis into her vagina. His penis was not fully erect and he experienced some difficulty in this act, making one thrust and withdrawing. He told Karen not to move and left. Karen waited several minutes to make sure he had gone and then called the police. She remained on the phone until their arrival, at which point she described to them what had occurred.

According to Karen the defendant was wearing a dark blue or black watch cap, a red and white bandanna over his face, a dark shirt and pants, and winter gloves. The entire incident took about 45 minutes. She had not previously had intercourse with him; nor did she consent to the sexual intercourse that night. Later that day she viewed a lineup and identified the defendant by his voice after all those in the lineup repeated certain phrases used by her attacker.

Testifying in his own behalf the defendant stated that he first met Karen at a bar, apparently in 1976. He dated her and first had sexual intercourse with her the same month at her apartment. He also had intercourse with her several times in a Palatine tavern's parking lot, in a restaurant parking lot, and at her home, including the time he brought her home from the Waukegan Speedway. On July 15 he was at her home at about 8 p.m. and had intercourse with her. He went to a bar and a

bowling alley and then to his home. At 2:45 a.m. he returned to her home and she let him in. Earlier that evening when he visited Karen he had observed her emerging from her bedroom, partially undressed, with another man. On this second visit he asked her about that and she started screaming. Defendant left and went home. He was arrested later that morning. Defendant denied that he had raped or cut Karen. He also denied having told Assistant State's Attorney Miller anything of a sexual nature.

(1)

Prior to trial defendant moved to suppress the identification testimony of Karen on the stated ground that the lineup she had viewed was improperly conducted. At the hearing on the motion defendant testified that at the lineup Karen did not identify him, instead identifying the man next to him. But after the lineup was over the police told him that Karen had identified him. According to defendant all five men in the lineup wore scarves of the same color over their faces and also wore caps. All repeated certain statements during the lineup.

The testimony of Commander Ward of the Palatine police department and of Karen was that Karen identified defendant in the lineup by the sound of his voice. Each man was wearing a white and gray wool hat, a long-sleeve shirt, dark trousers, and a red bandanna with a white floral pattern across the face. All were six feet or six feet, one inch in height.

■■ Defense counsel was prevented by the court from eliciting the testimony of Ward or Karen concerning Karen's prior description of the man she said had raped her. Citing *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, defendant now argues that accuracy of description was relevant to the propriety of the identification procedure. Defendant also suggests that the lineup should have been conducted in total darkness because that was how the incident occurred. He contends that he was prevented from raising this deficiency because the trial court barred testimony concerning Karen's prior description and its circumstances. We find no merit in these assertions. The basis of defendant's motion to suppress as developed by his testimony was the claim that he was not identified by Karen in the lineup, not that he was identified because of an improper lineup procedure. In *Manson* the court listed accuracy of prior description of the defendant as relevant in weighing the admissibility of an identification made under suggestive circumstances. Here defendant did not attempt to establish any suggestiveness in the lineup procedure. Indeed his testimony corroborated that of the State's witnesses concerning the manner in which all members of the lineup were similarly dressed with their faces concealed. We

find no error in the trial court's evidentiary rulings on this point. See *People v. Johnson* (1976), 43 Ill. App. 3d 649, 357 N.E.2d 151.

### (2)

██ At trial Officer Senyshyn of the Palatine police department was permitted to relate in detail, over defense objection, Karen's description of what had happened to her. She had related this to him when he came in response to her call to the police. Defendant contends that only the corroborative statement that she had been raped should have been allowed and the additional details constituted prejudicial hearsay. What defendant fails to discern is that these statements were admissible under the spontaneous utterance exception to the hearsay rule. The three factors necessary to establish this exception are an occurrence sufficiently startling so as to produce a spontaneous and unreflecting statement, the absence of time for fabrication after the occurrence, and the statement must relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Alexander* (1973), 11 Ill. App. 3d 782, 298 N.E.2d 355.) In this cause Karen testified that the attack began at 3 a.m. and lasted 45 minutes. She waited a few minutes to be sure the defendant would not return and then called the police. She remained on the phone until they arrived and then told them what had happened. Officer Senyshyn testified that he arrived at about 3:50 a.m. Karen appeared extremely upset just before she made her statement to him. Clearly this statement was made under conditions falling squarely within the requirements for spontaneous utterances. The victim had been raped only minutes before, she was still visibly upset, and her statement related to the circumstances of the rape. The trial court did not err in permitting this testimony.

### (3)

Defendant contends that he was prejudiced when the State cross-examined him in a manner improperly suggesting that he should have produced a potential witness. In her testimony Karen had related that in July 1977 defendant had driven her home from Waukegan Speedway, accompanied by a friend of the defendant named Nels. She recalled that defendant's car was not working properly and they ultimately stayed overnight in a forest preserve after it would not start following a stop. On direct examination defendant also recalled driving Karen and Nels back from Waukegan, but indicated that they only stopped once for 10 minutes. After he dropped Karen off he drove Nels home. Defendant also testified on direct examination that Nels was a friend of his with whom he used to work and that at the time of trial Nels was at Western Illinois University. On cross-examination the State elicited· from defendant the

information that Nels had worked with him but did not still do so and that Nels was a friend of his. Then the following questions were asked:

"Q: Where is Nels now?
A: Western Illinois University.
Q: He is not here, is he?
A: No, he is not.
Q: He is a friend of yours, isn't that correct?
A: That is correct.
[Defense Attorney]: Objection
The Court:            Overruled
[Assistant State's Attorney]: I withdraw the question."

Defense counsel then requested a mistrial because the State was insinuating that a necessary witness was not present. The State again told the court they were withdrawing the question, that the witness was "not acceptable" to both sides and they had no idea of his whereabouts. Defendant's motion was denied.

■■ It was the defense which first brought out that Nels was away at school and thus presumably unavailable for trial. The State's questioning elicited nothing new in this regard. Defendant cannot now complain of a line of questioning which he invited and which essentially mirrored that of his own counsel. (*People v. Bridgeforth* (1972), 51 Ill. 2d 52, 281 N.E.2d 617, *appeal dismissed* (1972), 409 U.S. 811, 34 L. Ed. 2d 66, 93 S. Ct. 100, 190.) The witness at issue was at most present during the occurrence of collateral events and was apparently asleep during much of that time. Under the circumstances we find no prejudice to the defendant arising from this questioning by the State. See *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.

(4)

■■ Defendant also contends that the court erred in permitting the introduction into evidence of the bloodstained bedsheet recovered from Karen's apartment. As was stated in *People v. Gardner* (1977), 47 Ill. App. 3d 529, 537, 362 N.E.2d 14, 20:

"* * * relevancy is established where the fact offered tends to prove a disputed fact or render the matter in issue more or less probable in light of logic, experience, and accepted assumptions of human behavior."

There was ample testimony tending to establish that Karen was cut in several places with a razor-knife and then placed on her bed and raped. Immediately after the occurrence the police were called and a sheet with a stain on it was recovered from the bed. Laboratory testing established that the stain was blood, although it was not determined whether it was human blood or how long it had been on the sheet. Karen was not asked

specifically whether her cuts bled but she did state, in explaining why a photograph of one of the cuts did not clearly show a cut, that "I guess you can't really tell red blood in black and white." The trial court is given a wide scope of discretion in ruling on issues of materiality and relevance. (*People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856.) Under the facts we have summarized, we find no abuse of discretion in the admittance into evidence of the bedsheet.

### (5)

Defendant questions the sufficiency of the evidence that penetration occurred, a necessary element of the offense of rape. (Ill. Rev. Stat. 1977, ch. 38, par. 11—1(b).) However Karen specifically testified that although the defendant was not fully erect and had difficulty inserting his penis he was able to do so. And contrary to defendant's claim, the testimony of Officer Senyshyn did corroborate this account. He recalled that Karen told him her assailant had penetrated her. In describing this she told him that the man accomplished this by forcing her to lie down on the bed and then "attempting to stuff it into her." Defendant suggests that this established lack of actual penetration, but in light of Karen's account of the physical state of her assailant we find that this reasonably described the manner by which he achieved penetration. According to the police the defendant admitted attempting to place his penis into the victim's vagina but was not certain if he succeeded in doing so. The question was one of fact for the jury and we find no basis for disturbing their determination of it.

### (6)

Defendant was convicted of two counts of aggravated battery, one alleging great bodily harm (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(a)), and the other the use of a deadly weapon (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(b)(1)). The State has conceded on appeal that both crimes were based on the same physical acts, in which the defendant cut the victim with a knife, so that under the rule enunciated in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, only one conviction may result. Accordingly we vacate the defendant's conviction for aggravated battery based on the infliction of great bodily harm. Because of our disposition of this issue we need not reach defendant's additional contention that his guilt on this charge was not established beyond a reasonable doubt.

■■ Finally we note that the trial court failed to impose sentences for the remaining convictions for aggravated battery and burglary; defendant was sentenced only on his conviction for rape. This had the effect of leaving the judgment incomplete. (*People v. Watson* (1979), 76 Ill. App.

3d 931, 395 N.E.2d 682.) We exercise our authority to remand the cause for sentencing on those two convictions. *People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540.

Defendant's conviction for aggravated battery based on infliction of great bodily harm is vacated; the remaining convictions are affirmed and the cause remanded for sentencing on those counts for which no sentence was imposed.

Affirmed in part; vacated in part; remanded for sentencing.

LINN, P. J., and JOHNSON, J., concur.