THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICHARD W. DOUGLAS, JR., Defendant-Appellant.

Fourth District   No. 4—88—0482

Opinion filed May 17, 1989.—Modified on denial of rehearing
June 14, 1989.

242

Daniel D. Yuhas and Peter L. Rotskoff, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On May 6, 1988, defendant Richard W. Douglas, Jr., was found guilty by a jury sitting in the circuit court of Adams County of com-

mitting two counts of the offense of aggravated criminal sexual assault and one count of unlawful restraint, in violation of sections 12—14 and 10—3, respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 12—14, 10—3). He was subsequently sentenced to 15 years' imprisonment on each sexual assault conviction, and three years' imprisonment on the unlawful restraint conviction, with said sentences to run concurrently. Defendant now appeals alleging numerous errors.

The trial commenced on May 3, 1988, with the testimony of Sharon Tedrow, who is employed as a supervisor of the dispatchers for the Quincy police department. On October 22, 1987, at approximately 8:35 a.m., the department received a telephone call from K.H. This conversation was automatically recorded and played for the jury.

The transcript establishes K.H. was distraught and frightened for her life. She stated she had been raped, and named the defendant as the perpetrator. She further stated she had been confined for 18 hours against her will; defendant had her car keys; defendant had a gun; and she had locked defendant out of the apartment and was frightened he would return. Tedrow kept K.H. on the telephone until the police arrived at K.H.'s location.

K.H., the victim, testified she is 27 years old and resides in Springfield. On October 21, she traveled to Quincy, where she met her friend, Teresa Dodd, and they visited another friend at the hospital. After leaving the hospital, they went to various bars, starting at 5:30 p.m., before arriving at the Casino Starlight Terrace at approximately 11:30 p.m. with another friend. K.H. had been drinking throughout the night and had consumed approximately six drinks of tequila and lime juice. She stayed at the Casino until closing time at 2:30 a.m. About 6 p.m., she had, unbeknownst to Dodd, injected some cocaine intravenously. This has the same effect as drinking 10 to 12 cups of coffee and lasts about two hours. By 2:30 a.m., she was feeling the effect of the alcohol, but she was not drunk.

Shortly after they arrived at the Casino, she met defendant. She knew him from attending grade school with him in Quincy. At the time, K.H. and Dodd were seated next to the dance floor, and he came up to them. He spent some time at their table, and they all danced together. At closing time, he asked K.H. for a ride home and she agreed. K.H. got her car keys from Dodd and told Dodd she would be right back.

K.H. and defendant left and, since there were police outside and she had been drinking, she asked defendant to drive. Defendant then began driving around for quite awhile. K.H. asked to drive, but

defendant would not let her. Eventually, he pulled over on a dirt road and stopped. She started to open the door to get out, but he grabbed her left arm and leaned across her closing the door. He then pushed her car seat down, climbing on top of her and twisting her left hand behind her head while she struggled. He pulled her skirt up and her panties and pantyhose off. While she struggled, he told her, "I could kill you right now and throw you off the bridge and no one would ever find your body." He repeated this several times, and she believed him. At one point, she tried to frighten him off by saying she had genital herpes, and he told her he had AIDS. He then had forcible intercourse with her.

Afterwards, he climbed back into his seat and continued driving. He went to a car window pay phone and made a call, stating he had to call his cousin. K.H. tried again to exit the car, but defendant held her arm. They then went to some apartments. When defendant exited the car, K.H. attempted to lock the doors, but he was able to get them unlocked, and he dragged her out of the car. K.H. was screaming while she was in the car but, once he opened the door, he grabbed her by the throat, and she was unable to continue doing so. He took her to an apartment which contained a lady and a little girl. K.H. was struggling and attempted to ask for help, but defendant forced her down the hall into the bedroom.

Once inside the bedroom, he pushed her on the bed and held her by her throat and arm to keep her quiet. Later, after it became light out, she heard the apartment occupants get up and leave. Defendant then forcibly had sexual intercourse with her. Again, he made threats to her. They then went to get a drink of water. She saw her car keys on the counter and took them without him seeing her. She then ran to the apartment door and fled outside screaming for help and asking someone to call the police. Defendant caught up with her from behind, grabbed her by the throat, cutting off her screams, and dragged her back into the apartment.

He put her in a chair and started looking for the car keys. At that point, there was a knock on the door, and defendant, looking through the peephole, noticed it was the police. K.H. did not scream because she did not wish to agitate defendant, and she was not sure if the police would break the door down. Eventually, since they did not answer, the police left.

She then told defendant the police would not leave because her car was outside, and there was a warrant for her arrest. There was no outstanding arrest warrant, but she hoped he would go outside. He recommenced looking for the keys and called the lady from the apart-

ment on the phone looking for them. She pretended to find the keys and gave them to defendant. When he went outside, she locked the door and called the police. Once the police were on the line, she lost all control and is not even sure what she said. The police then arrived back at the apartment.

At the hospital, she had them examine her left wrist because she believed her arm was broken. She also had her throat examined. Her throat hurt for over one week, and she had trouble talking and swallowing. She had bruises on her throat, chest, upper arm, and wrist.

Since the assault, K.H.'s life has been adversely affected. She weighed 148 pounds before the attack and, in February, was below 110. She and her husband no longer go to movies if they contain any violence. She also cannot go into a convenience store if a black person is there. She had never been afraid of black people before and, in fact, had black friends. She quit her job and is in counseling. Immediately afterwards, she developed a cleaning obsession since she always felt dirty. She shaved all the hair off her body except her head hair. She cannot sleep without medication, and her marriage is in difficulty.

Teresa Dodd, K.H.'s friend, testified next. She was with K.H. the entire evening. Dodd drove to the Casino in K.H.'s car because K.H. had been drinking and she was not. K.H. was not drunk but had begun feeling the effect of the drinks. Defendant came up to their table at the Casino and began speaking to them. At closing time, she heard him ask K.H. for a ride home. When she gave the keys to K.H., she asked how long she would be gone. K.H. told her it would be about five minutes and asked if she wished to go along. Dodd declined. She never saw K.H. flirt or encourage defendant.

James Clapp, a friend of Dodd's, testified he was working at the Casino on the night in question. He overheard K.H. talking with Dodd at closing time. She told Dodd she was going to give defendant a ride home and would be right back.

Florence Albert lives in the Cardinal apartment complex in Quincy. She shares a common wall with the apartment of Candice Green. On October 22, between 3 and 3:30 a.m., she was awakened by loud noises. They eventually stopped. Again, between 7 and 7:30 a.m., she heard a loud slam and some more noises which she could not identify.

Fern Bowen also lives in the Cardinal complex. On the morning of October 22, she was doing laundry in the laundry room of the complex between 7:30 and 8 a.m. She was pushing her laundry cart along the parking lot when a young white girl came running out of a building crying and screaming for help. A black man chased her down,

grabbed her by the head or throat, and dragged her back into the building. The girl was struggling, attempting to get away. Bowen called the police and directed them to the building in question. The police left. A short time later, she saw the black man come out, look around, and go back into the building. The police returned soon thereafter.

Mildred Ward lives in the complex down the hall from Candice Green. On the morning of October 22, she heard a girl yell for help. A short time later, the police arrived, and she told them what she heard. After they left, she heard a loud slam. She looked out and saw a young man run outside. He stood still looking everywhere and then ran fast, got into a car, and sped off. The police returned soon thereafter.

Steve Albert, a Quincy police officer, went to the Cardinal Apartments in response to the first call. He spoke with Ward, but was unable to raise anyone in the other apartments. So he left. In about 10 minutes, he received another call to go to apartment No. 33 at the complex and speak with K.H. When she opened the door, the first thing she did was hug him. Her hair was messy, her clothes were disorganized, and her makeup was running. She was crying uncontrollably, and her eyes were red and swollen. She had an abrasion on her neck which appeared to be finger marks. Her arms were red and swollen. During the interview, she indicated she was going to be sick and left the room. He was with her for over one hour, and she never calmed down. She did not appear to be under the influence of alcohol or drugs.

Later that day, Officer Albert received a telephone call from a person identified as Richard Douglas. Albert told him to come to the police station to talk. Defendant wanted to know if he was going to be arrested and if he should bring bond money. Defendant then told Albert where he could find K.H.'s car.

Brenda Williams, an investigator with the Quincy police department, arrived shortly after Officer Albert. She observed that K.H. was very nervous and her face was flushed. Her voice was shaky, and she was stammering as she spoke to Albert. She was trembling like a small, frightened child. She held her coat pulled tightly about her and kept flexing her fingers into the fabric. At times, she would completely hide her face in the coat.

Williams took K.H. to the hospital. When she exited the car, K.H. hid her face in her coat, stating that if anybody saw her, they would know why she was there. At the hospital, Williams observed bright red marks and scratches on K.H.'s throat. She also saw bruises on

K.H.'s arms, and that her left wrist was swollen. Later that afternoon, she reinterviewed K.H. K.H. started out quietly but became ill and vomited in the office when discussing the possibility of becoming pregnant.

Investigator James Rost described K.H. as being hysterical and crying very hard while at the apartment. Officer James Cress found K.H.'s car in the Puzzle's Bar parking lot with the keys on the console. Shoes, panties, and pantyhose were found in the car.

Donna McCain was the nurse on duty in the emergency room when K.H. came in. When she first saw K.H., K.H. was crying and appeared disheveled. K.H.'s emotions changed frequently between crying, laughter, and anger. K.H. told McCain, as part of the background information, that she was raped twice and that she struggled the whole time. K.H. also told her that the assailant stated he had AIDS. McCain did not observe anything to lead her to believe K.H. was under the influence of drugs or alcohol.

Philip Sallee, a forensic serologist, testified concerning tests he ran. Seminal material was discovered on K.H.'s skirt, in her vagina, and on the seat of her car. This material could have come from defendant.

Susan Carr was the State's final witness. She is the executive director at the Rape Information and Counseling Service in Springfield. After *voir dire*, the court determined she qualified as an expert witness concerning the rape trauma syndrome and related stress. Carr explained that post-traumatic stress disorders are a cluster of symptoms observed in people who have experienced a traumatic event. The rape trauma syndrome is a subcategory of post-traumatic stress disorders and has a cluster of symptoms specific to it which rape victims exhibit. Originally, it was thought the syndrome had three stages, but now it is accepted that there are five.

Carr counseled with K.H. four times, with the first being on October 26. K.H. expressed a fearfulness of being left alone. K.H. had an intense aversion to the clothes she was wearing at the time of the incident and to the vehicle involved. She had a need to feel clean by constant bathing. She stated she shaved all the hair off her body. There was also a detachment from what she was talking about. Carr stated all these are consistent with symptoms suffered by someone suffering from rape trauma syndrome.

Carr was also present when K.H. testified. She observed K.H. suffered severe stress when recollecting events around the incident. K.H. showed outbursts of anger and irritability, and did not look at the jury. Carr stated these behaviors are also consistent with the rape

trauma syndrome.

Defendant's first witness was Candice Green, defendant's cousin. She resides at the apartment in question with her young daughter. Around 3 a.m., on October 22, she received a telephone call from defendant asking that she leave the door open. A short time later, he showed up with a white woman. He entered the apartment first, followed by her. He did not have a hold of her. They talked for 5 or 10 minutes while defendant played with the little girl. They then went back to the bedroom. In the morning when Green arose, the woman was in the bathroom, and Green entered the bedroom to get her clothes. She left for work by 7:30 a.m. Shortly after she got to work, she received a telephone call from defendant looking for the car keys. She acknowledged she has a close relationship with defendant.

Defendant testified he arrived at the Casino about 9 p.m. on October 21. He was coming off the dance floor when K.H. walked past and called his name. He spent some time at her table and danced with K.H. While they were dancing, she asked if he knew where she could get some cocaine. He told her he might be able to help. He noticed the bloodstain on her arm from shooting up with cocaine. At closing time, she told him she wanted to go in her car, but she wanted to get rid of her friends. He suggested she tell them she was giving him a ride home. They got the keys from Dodd and left. She let him drive because he knew where the cocaine was.

They drove to various spots but could not find anyone home. They then parked and began talking. Soon they were kissing and starting sexual relations. She said she did not want to have sex in the car. He suggested they call his cousin, which he proceeded to do. In the car, there was no struggle, nor did she resist his advances. He also was not restraining her.

At the apartment, he walked in first, and K.H. followed. They spoke with Green for a while and then went back to the bedroom. The next morning, while K.H. was in the bathroom, Green came in and got some clothes. After Green left, he and K.H. voluntarily had sexual relations again.

Later, he was looking for the car keys and could not find them. He called Green, and she told him they were on the counter, where he found them. K.H. became insistent on going to get some cocaine. She got antsy and ran outside. He followed and grabbed her, bringing her back to the apartment. He put both arms around her and picked her up. He did not grab her throat. He never heard K.H. scream for help. He also did not understand why she was running towards the car since he had the keys. Shortly thereafter, he heard sirens, and there

was a knocking at the apartment door. He believed it was the police. No one answered the door. After a while, the two of them began sneaking out of the apartment complex. K.H. suddenly ran back into the apartment, slammed the door, and would not let him in. He got into her car and drove it to Puzzle's, leaving it there and getting a ride from someone at Spanky's Furniture Store.

He heard the police wished to speak to him. He called them around noon. They wanted him to come in and talk. He thought they were going to arrest him over the taking of the car. That is the reason he inquired if he would need bond money.

Defendant was charged with two counts of aggravated criminal sexual assault and one count of unlawful restraint. The jury found him guilty of all charges. At the sentencing hearing, the court noted defendant had a previous conviction for criminal sexual abuse. Accordingly, the court sentenced him to serve concurrently 15 years' imprisonment on each sexual assault conviction and three years' imprisonment on the unlawful restraint conviction. Defendant now appeals. We affirm.

Defendant's initial contention is that he was not proved guilty beyond a reasonable doubt of the offense of aggravated criminal sexual assault. Defendant first contends that K.H.'s testimony was not clear and convincing, nor was the testimony sufficiently corroborated to support a conviction. We disagree.

Allegations of sexual misconduct are easily made, hard to prove, and harder to defend. (*People v. Nunes* (1964), 30 Ill. 2d 143, 146, 195 N.E.2d 706, 707.) Accordingly, a conviction for aggravated criminal sexual assault or abuse, where the defendant denies the charge, will be upheld when the testimony of the complainant is clear and convincing, or it is corroborated by other evidence. *People v. Cregar* (1988), 172 Ill. App. 3d 807, 819, 526 N.E.2d 1376, 1385; *People v. Server* (1986), 148 Ill. App. 3d 888, 894, 499 N.E.2d 1019, 1024, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131.

Defendant maintains that K.H.'s testimony should be given little regard. He notes she admits to drug and alcohol use. He believes this greatly diminishes her credibility. He also points out that statements K.H. made in the recorded telephone call, such as the fact that defendant had a gun and that she was confined for 18 hours, were clearly incorrect and indicate she was acting under a delusion. However, a complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect to be clear and convincing. (*People v. Findlay* (1988), 177 Ill. App. 3d 903, 911, 532 N.E.2d 1035, 1041; *People v. Henne* (1988), 165 Ill. App. 3d 315, 323, 518 N.E.2d 1276,

1281.) It is clear and convincing where it is consistent and where discrepancies do not detract from its reasonableness. (*People v. Escobedo* (1986), 151 Ill. App. 3d 69, 81-82, 502 N.E.2d 1263, 1271.) Any weakness in the testimony, such as the inability to remember exact dates and times, as well as other minor contradictions or inconsistencies, only affect the weight to be given the testimony and do not themselves create a reasonable doubt. (*People v. Sexton* (1987), 162 Ill. App. 3d 607, 612, 515 N.E.2d 1359, 1363.) As long as the discrepancies do not detract from the reasonableness of the complainant's story as a whole, it may be found clear and convincing. *Findlay*, 177 Ill. App. 3d at 911, 532 N.E.2d at 1041.

We find K.H.'s testimony clear and convincing. The testimony concerning her drug use was that the effects would have worn off long before the incident. Also, the testimony established that, while she was feeling the effects of the alcohol, she was not so drunk as to not be aware of what was happening. Her testimony and explanation of the evening was reasonable and consistent.

This is in marked contrast to that of defendant. Defendant asserts the sexual relationship was consensual. He testified they both became involved in the car, but K.H. stopped him short of completing the act while they were in the car. This occurred prior to 3 a.m. Yet, it was defendant's testimony that they did not have sexual relations in the apartment until after 7:30 a.m. This does not sound like a couple anxious to have a physical relationship. He also stated he grabbed K.H. from behind, carrying her back to the apartment, and did not hear her scream for help. Yet, the testimony of the independent witnesses and the marks on K.H.'s throat establish otherwise. In view of these discrepancies, defendant's assertion that the relationship was consensual rings hollow.

Further, even if K.H.'s testimony was not convincing, the evidence, which is set out in great detail, clearly corroborates the testimony and resolves any doubt. The extent of K.H.'s injuries supports her testimony. She had marks around her throat, which looked like fingers, and she had trouble talking or swallowing for several days afterwards. She also had bruises on her arms and a swollen wrist. Defendant gave no explanation for these injuries. The testimony of the ladies at the apartment complex also supports the conviction. They heard noises at 3 a.m. and again at 7:30 a.m. One saw defendant chase K.H. down from behind while she was screaming for help. She saw him grab K.H. by the throat and drag her off. Also, the testimony of the police established that K.H. was disheveled, crying, and in shock when they spoke to her. In fact, she became physically ill

twice when talking about the incident. Even the transcript of the initial telephone call to the police established she was frightened and hysterical. K.H.'s testimony concerning the disabling effects on her life, such as the loss of weight, lack of sleep, marital problems, and cleaning obsessions, supports the conclusion that a traumatic event occurred. Additionally, K.H. stated defendant told her he had AIDS, which was corroborated by nurse McCain's testimony. This is not the sort of comment one would expect in a consensual relationship. The evidence is overwhelming without even considering the rape trauma syndrome evidence, which further supports the conviction.

■ Defendant next maintains the State failed to prove he acted in such a manner as to threaten or endanger the life of the victim. This is the aggravating factor which elevates the offense of criminal sexual assault to aggravated criminal sexual assault of which defendant was convicted. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14.) Defendant's threats to kill K.H. and throw her body in the river, plus the injuries, including the marks to her throat, are sufficient to establish defendant acted in such a manner as to threaten or endanger K.H.'s life.

■ Defendant next maintains the court erred by allowing expert testimony. Susan Carr was qualified as an expert witness and was allowed to testify concerning the rape trauma syndrome (RTS) and whether K.H. exhibited symptoms consistent with RTS. She was also allowed to sit in the courtroom during K.H.'s testimony and allowed to testify whether K.H.'s manner on the stand was consistent with someone suffering from RTS. Defendant believes this was error. Defendant's argument is three-pronged. He argues (1) Carr should not have been qualified as an expert witness; (2) Carr should not have been allowed to observe K.H.'s courtroom demeanor and testify to it; and (3) the testimony concerning RTS should not have been introduced.

In qualifying Carr as an expert and allowing the testimony concerning RTS, the court relied on *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131, where this court allowed expert testimony concerning RTS on rebuttal in a case involving child abuse. Defendant asserts *Server* should be limited to its facts and the present case is distinguishable.

Defendant's initial contention is that Carr does not have a formal psychology degree and, thus, should be barred from being considered an expert on the psychological condition known as RTS. He notes, in *Server*, the expert was a clinical psychologist who had been involved

in counseling in the field of sexual abuse and assault since 1975.

An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge which is not common to laypersons, and where such testimony will aid the trier of fact in reaching its conclusion. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208, 469 N.E.2d 569, 576.) A party who tenders an expert to the court has the burden of establishing the qualifications of the expert. (*Server*, 148 Ill. App. 3d at 899, 499 N.E.2d at 1026-27.) This determination is directed to the sound discretion of the trial court and will be disturbed only when it constitutes an abuse of that discretion. *People v. Bradley* (1988), 172 Ill. App. 3d 545, 550, 526 N.E.2d 916, 920.

The indicia of expertise is not a given level of academic qualifications, but whether the expert has knowledge and experience beyond the average citizen, which would assist the jury in evaluating the evidence. (*Bradley*, 172 Ill. App. 3d at 550, 526 N.E.2d at 920.) Irrespective of how specialized knowledge was acquired, whether through education, training, experience, or a combination of each, if the witness possesses such knowledge, he may testify. (*People v. Lang* (1982), 106 Ill. App. 3d 808, 813, 436 N.E.2d 260, 265.) Specialized formal training is not necessary, and experience alone may qualify one as an expert. *People v. Jackson* (1986), 145 Ill. App. 3d 626, 633, 495 N.E.2d 1207, 1214; *Lang*, 106 Ill. App. 3d at 813, 436 N.E.2d at 265.

On *voir dire*, Carr testified that she is the executive director and clinical director at the Rape Information and Counseling Service in Springfield, which provides crisis intervention counseling but does not perform long-term counseling. She has been thusly employed for three years. Prior to that, she ran a program for chronically mentally ill people at the Mental Health Center in Lincoln. Her formal education includes a degree in liberal arts. She took numerous psychology courses in college. She also took 40 hours of graduate training, including courses in pastoral and family counseling. She has received 120 hours training in rape trauma and counseling in crisis intervention. She has received training on RTS, including some continuing education units from the University of Kentucky.

She explained RTS was first identified in 1974 and formally accepted in 1980. Since it is so new, there is little formalized training at the universities about it. She has counseled over 200 people. She is also a guest lecturer at the graduate program of Sangamon State University and has trained the psychologist at the Mental Health Center in Springfield in identifying RTS.

On cross-examination, she explained RTS was accepted by the American Psychological Association in 1980. She testified it is now

contained in the third edition of the Diagnostic and Statistical Manual (DSM III) as a subcategory of the post-traumatic stress disorder. The court determined Carr qualified as an expert witness concerning RTS and related stress.

Similarly, in *Server*, the expert testified that this field of study is new, and there are no degree courses of study in it. Accordingly, she observed that most education in this area is received from clinical interviews and observations. This court, finding no abuse of discretion in the trial court qualifying her as an expert, further noted the areas of inquiry were limited to the expert's area of knowledge.

In the present case, we find Carr's lack of a psychology degree as not determinative. It is clear this is a new, recognized field of study to which there is no academic course of study. It is also apparent Carr has taken great pains to receive what education is available. She has had years of hands-on experience and is recognized by others in Springfield as extremely knowledgeable in her field. She has a knowledge and experience beyond the average citizen, which would assist the jury in evaluating the evidence. We find the trial court did not abuse its discretion in qualifying her as an expert.

■■ Defendant argues that, even if Carr is an expert, she should not have been allowed to observe K.H. testify and then testify that some of K.H.'s conduct on the stand was consistent with someone suffering from RTS. Defendant believes this is erroneous because it allows Carr to comment on the credibility of K.H. and invades the province of the jury.

In *Server*, the experts were allowed to observe the victim's testimony before testifying as to whether the victim's conduct was inconsistent with a person suffering from RTS. This court found no error with this procedure. *Server*, 148 Ill. App. 3d at 899, 499 N.E.2d at 1027.

Similarly, we find no error here. It is within the discretion of the trial court to permit a psychiatrist or psychologist to remain in the courtroom to observe a defendant charged with a crime testify, and to use the observations as a basis for his opinion as to the sanity of that defendant. (See *People v. Cunningham* (1966), 73 Ill. App. 2d 357, 218 N.E.2d 827.) We have no difficulty, under the facts of this case, with extending this holding to an expert witness. Further, defendant's concern that Carr was improperly commenting on K.H.'s credibility is misplaced. She, at no time, spoke concerning the veracity of K.H.'s testimony. She simply noted certain conduct which was consistent with a person suffering from RTS.

■■ ■ Defendant next contends that Carr's testimony concern-

ing the syndrome was improperly admitted. In *Server*, the court allowed testimony of this nature on rebuttal for the limited purpose of explaining to the jury how child victims of sexual assault react. (*Server*, 148 Ill. App. 3d at 899, 499 N.E.2d at 1026.) Defendant believes this holding should be limited to cases involving child victims and, accordingly, should not be applied to his case. He also believes Carr was improperly allowed to testify that K.H. was actually suffering from RTS, rather than limit her testimony to whether K.H.'s conduct was consistent with one suffering from that syndrome.

Initially, we observe the legislature has cleared the path for admission of this testimony in future cases. Section 115—7.2 of the Code of Criminal Procedure of 1963 has been amended, effective January 1, 1989, to provide that in a case involving perpetration of an illegal sexual act, as defined, testimony by an expert, qualified by the court, relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible. (Pub. Act 85—1279, eff. Jan. 1, 1989; 1988 Ill. Legis. Serv. 2280 (West).) However, this does not answer whether the evidence was properly admitted in this case.

We are aware courts throughout the land are divided on this question. Some, for various reasons, have found it inadmissible. (See *State v. Black* (1987), 109 Wash. 2d 336, 745 P.2d 12; *State v. Bowman* (N.M. App. 1986), 104 N.M. 19, 715 P.2d 467; *People v. Bledsoe* (1984), 36 Cal. 3d 236, 681 P.2d 291, 203 Cal. Rptr. 450; *State v. Saldana* (Minn. 1982), 324 N.W.2d 227.) However, an increasing number of courts are allowing admission of this testimony. See *State v. McCoy* (W. Va. 1988), 366 S.E.2d 731; *People v. Hampton* (Colo. 1987), 746 P.2d 947; *State v. Allewalt* (1986), 308 Md. 89, 517 A.2d 741; *State v. Huey* (1985), 145 Ariz. 59, 699 P.2d 1290; *State v. McQuillen* (1984), 236 Kan. 161, 689 P.2d 822; *State v. Liddell* (Mont. 1984), 685 P.2d 918; *State v. Marks* (1982), 231 Kan. 645, 647 P.2d 1292.

In Illinois, expert testimony will be admitted if the expert has some knowledge or experience, not common to the world, which will aid the court or jury in arriving at a determination on the question or issue. (*People v. Free* (1983), 94 Ill. 2d 378, 411, 447 N.E.2d 218, 234; *Server*, 148 Ill. App. 3d at 897, 499 N.E.2d at 1026.) It is admitted to aid the jury, and the credibility of the expert and the weight to be accorded his testimony is a matter for the trier of fact to determine. *Server*, 148 Ill. App. 3d at 897, 499 N.E.2d at 1026; *People v. Platter* (1980), 89 Ill. App. 3d 803, 819, 412 N.E.2d 181, 191.

It is evident knowledge of the rape trauma syndrome and the conduct its sufferers exhibit is beyond that common to the layperson. Accordingly, the testimony concerning this syndrome and whether K.H.'s

conduct is consistent with that of someone suffering from it would be helpful to the fact finder on the question of consent. We find no error with its admission.

■■■ Defendant argues that, even if it is found admissible in principle, in this case, there is error because Carr testified K.H. was suffering from RTS which improperly encroaches on the jury's duty of determining credibility by bolstering K.H.'s testimony. The trial court properly attempted to limit the testimony of Carr to the question of whether the conduct was consistent with RTS. In fact, the court, on its own, would at times restrict the State's questioning to avoid this problem. Nevertheless, our review establishes that, during Carr's extensive direct testimony, there were two instances when she referred to what stage of RTS K.H. was suffering from at a given time.

However, we need not determine if this is reversible error since we find the allegation waived. At neither instance did defendant object. (See *People v. Stewart* (1984), 105 Ill. 2d 22, 56, 473 N.E.2d 840, 857; *People v. Davidson* (1987), 160 Ill. App. 3d 99, 119, 514 N.E.2d 17, 31, *appeal dismissed* (1988), 487 U.S. 1212, 101 L. Ed. 2d 897, 108 S. Ct. 2860.) Nor did he include this allegation in his post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30, *cert. denied* (1988), ___ U.S. ___, 102 L. Ed. 2d 263, 109 S. Ct. 274; *People v. Jarnagan* (1987), 154 Ill. App. 3d 187, 192, 506 N.E.2d 715, 719.) These omissions alone waive any allegation of error. Further, defendant elicited the same testimony in much greater detail. This occurred even after the court, during cross-examination, explained to defendant that "the Court has not suggested that [Carr] can give an opinion as to whether or not [K.H.] was in fact in post-rape syndrome, only that indices that were there were consistent." Where a defendant does not object to testimony and elicits the same testimony on cross-examination, any error in the testimony is waived. *Jarnagan*, 154 Ill. App. 3d at 192, 506 N.E.2d at 719.

■■■ Defendant next contends the court erred by allowing admission of the tape recording of K.H.'s initial telephone call to the police. He maintains this is improper hearsay, and its admission prejudiced him, requiring a new trial.

Initially, we note that defendant did not raise this objection at trial. His sole objection then was to the quality of the tape. It is settled that objections at trial on specific grounds waive all other grounds of objections. (*People v. Barrios* (1986), 114 Ill. 2d 265, 275, 500 N.E.2d 415, 419; *People v. Jones* (1975), 60 Ill. 2d 300, 307, 325 N.E.2d 601, 604.) Further, defendant included no reference to admission of the tape recording in his post-trial motion, which also acts as a

waiver. See *Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1129-30; *Jarnagan*, 154 Ill. App. 3d at 192, 506 N.E.2d at 719.

Moreover, if the merits of the complaint are addressed, it is clear the tape was properly introduced as a spontaneous declaration. To qualify as such and be admissible regardless of a declarant's presence at trial, three elements must exist: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Robinson* (1978), 73 Ill. 2d 192, 199, 383 N.E.2d 164, 168; *People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804, 807.) "The pertinent point is whether there was a lack of sufficient time to allow an opportunity for reflection and invention." *Poland*, 22 Ill. 2d at 181, 174 N.E.2d at 807.

In the present case, K.H. telephoned the police immediately after locking defendant out of the apartment, having been held prisoner and assaulted in excess of five hours. It is evident from the tape that she was near hysteria. Also, the testimony of the officers who saw her shortly thereafter established that she was shaking, crying, and hysterical. This short time frame and the highly emotional state of K.H. qualifies the tape as a spontaneous declaration. See *People v. Quinlan* (1980), 85 Ill. App. 3d 1079, 1084, 407 N.E.2d 935, 939-40; *People v. Hayn* (1976), 34 Ill. App. 3d 1029, 1035, 341 N.E.2d 182, 187.

■■■ Defendant next complains the court erred by allowing Nurse McCain to testify to K.H.'s statements to her concerning the assaults, which McCain recorded in the hospital report. Defendant insists this evidence is hearsay and prejudiced his case.

We need not address the merits of his position. Defendant did not object to this testimony at trial. Rather, he cross-examined McCain in detail concerning the report, and attempted to introduce the entire report into evidence. In fact, the only mention of this report in defendant's post-trial motion was the assertion that the court erred by refusing its admission.

Failure to object at trial waives any issue on appeal. (*Stewart*, 105 Ill. 2d at 56, 473 N.E.2d at 857; *Davidson*, 160 Ill. App. 3d at 119, 514 N.E.2d at 31.) This is true also of the failure to include it in the post-trial motion. (*Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1129-30.) Further, where a defendant fails to object to testimony and elicits the same or similar testimony in cross-examination, any error in the testimony is deemed waived. (*Jarnagan*, 154 Ill. App. 3d at 192, 506 N.E.2d at 719.) Since, due to the overwhelming evidence, the plain error exception does not apply, this question is waived.

■■ Defendant next contends he was denied a fair trial by the testimony of McCain, Carr, and Williams that K.H. reported she had been sexually assaulted. He notes that evidence that K.H. complained of being assaulted was contained in the tape of the initial telephone call. Therefore, he asserts the hearsay statements of the others served no purpose as corroborative statements, and their cumulative effect prejudiced his case.

We find no error. We have reviewed the testimony of Carr and Williams and can find no reference to K.H. telling them she had been sexually assaulted. While, due to the nature of her testimony, Carr's testimony alluded to the "incident," she did not relate what K.H. told her about it until cross-examination. Williams simply stated she responded to a rape call, and she told the nurse K.H. was a possible rape victim. There is no indication where Williams received this information. McCain did relate K.H. told her she had been sexually assaulted. However, defendant did not object at the time, cross-examined her on this information, and failed to include any reference to it in his post-trial motion which, as noted earlier, results in the issue being waived.

■■ Defendant next insists the court considered an improper factor in sentencing him. On June 8, 1988, a sentencing hearing was conducted. After hearing arguments, the court reviewed the relevant mitigating and aggravating factors and stated:

"As to each count of the crime of aggravated criminal sexual assault, the Court hereby sentences you to a determinate term in the Department of Corrections for the determinate period of 15 years. As to the charge of unlawful restraint, a Class IV Felony, the Court sentences you to the determinate term of three years.

All the sentences are to run concurrently. That means at the same time, Mr. Douglas.

Now, I do not like to sentence anybody to the Department of Corrections. And I say that to every person that I send there, because I want you to understand when you leave here today that I do not take lightly what my responsibility is in sentencing you or anyone else to the Department of Corrections.

That is no place anyone should want to go. And it is certainly no place that I take pleasure in sending anyone. But you left the Court no alternative so far as I am concerned. You have shown in your past conduct that you are not willing to comply with the laws with regard to this area. And I think that

is an appropriate sentence.

You know, and your attorney knows, that you won't do 15 years anyway. You will do half of that. So it's not as long as it may sound. But you have to be sentenced, and you have to be sentenced severely for your conduct.

You have earned this trip to the Department of Corrections. And my sympathy goes to [K.H.] and to your family. My sympathy does not go to you."

Defendant argues this reference to the good-time credit was consideration of an improper sentencing factor. However, we do not read the court's comments as indicating it considered the good time as a sentencing factor. Prior to the questioned language, the court had reviewed what it found to be aggravating factors. These included the impact on the victim and the fact the evidence against defendant was overwhelming. The court also observed defendant had several prior convictions, but the court found most important his conviction for criminal sexual abuse for which defendant was placed on probation and served 120 days in jail. These were the factors relied on in imposing sentence. The remaining comments were merely an explanation to defendant of the practical ramifications of the court's decision.

■ Finally, defendant asserts the criminal sexual assault statute is unconstitutional for two reasons, the first being that the statute is overbroad. The statute defines sexual penetration as:

"[A]ny contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).)

Defendant notes a sexual penetration can occur without evidence that it was done for the purpose of sexual gratification or arousal of the victim or the accused, which is part of the definition of sexual conduct. (See Ill. Rev. Stat. 1987, ch. 38, par. 12—12(e).) He maintains that the failure to so limit the definition of sexual penetration makes the statute overbroad since a parent bathing a child could inadvertently penetrate the child and commit the offense of criminal sexual assault.

Defendant raises this argument for the first time on appeal. Generally, questions of the constitutionality of a statute cannot be raised for the first time on appeal, and defendant has, thus, waived this is-

sue. (*Cregar*, 172 Ill. App. 3d at 826, 526 N.E.2d at 1389; *People v. Whitfield* (1986), 147 Ill. App. 3d 675, 680, 498 N.E.2d 262, 266.) On the merits, it is evident that defendant misapprehends the statute. The offense of criminal sexual assault requires that the use or threat of use of force accompany the sexual penetration. (Ill. Rev. Stat. 1987, ch. 38, par. 12—13.) In *People v. Haywood* (1987), 118 Ill. 2d 263, 515 N.E.2d 45, our supreme court, in denying slightly different constitutional challenges to this statute, observed that the statute was designed to proscribe those acts of sexual penetration accomplished by the use of force. Thus, it is apparent defendant's hypothetical situation would not come under purview of the statute, and that the statute is not overbroad.

Defendant's second constitutional argument is not only waived for failure to raise it at trial but has been previously addressed and dismissed by this and other courts. See *People v. Bartay* (1986), 150 Ill. App. 3d 130, 132, 501 N.E.2d 364, 365-66; *People v. Burmeister* (1986), 147 Ill. App. 3d 218, 223-24, 497 N.E.2d 1212, 1215-16.

For the above-stated reasons, the convictions of defendant and the sentences imposed by the circuit court of Adams County are affirmed.

Affirmed.

SPITZ and GREEN, JJ., concur.