THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY STEFFENS, Defendant-Appellant.

Fourth District No. 4—90—0291

Opinion filed February 7, 1991.

Harold M. Jennings, of Jennings, Novick, Ensign & Ostling, of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LUND delivered the opinion of the court:

On January 30, 1990, defendant Gary Steffens was found guilty by a jury sitting in the circuit court of McLean County of possessing a rosette rivet which has not yet been attached to, or which has been removed from, the original vehicle, in violation of section 4—103(a)(5) of the Illinois Vehicle Code (Code) (Ill. Rev. Stat. 1989, ch. 95½, par. 4—103(a)(5)). He was subsequently sentenced to two years' conditional discharge. Defendant now appeals.

The trial commenced on January 29, 1990. Edward Shumaker testified that he has been employed by the Illinois State Police for an excess of 20 years. Since 1987, he has served in the vehicle identification and auto theft section. He has had various training sessions concerning rosette rivets, some occurring in 1970 at the State Police Academy.

Once he was assigned to his present position, he had more training and refresher courses every three months at the academy. (Not every course involved rosette rivets.) They also went to the Chrysler plant in Belvidere in 1988 to observe the use of rosette rivets. This trip was sponsored by the Vehicle Identification Bureau of the Illinois State Police. While there, they observed the workers attach the vehicle identification number (VIN) plates to cars using the rosette rivets.

This is done in a secure area of the plant. He described unused rosette rivets as being approximately two inches long, with the rivet head having a rose-petal design. This is why it is called a rosette rivet.

He explained that the rosette rivets are key in determining whether the VIN plates have been altered. The rosette rivets are unique, and they are not available to the public. Since 1965, all American-made General Motors cars have used them exclusively to attach the VIN plates. Chrysler and Ford began using them a couple of years later. Foreign cars made outside the United States use only circular pop-head rivets. However, foreign cars assembled in the United States use the rosette rivets. Thus, in looking at a VIN plate to determine its authenticity, the first items to be examined are the rivets to make certain they are rosette rivets. Shumaker estimated that over his career he has seen rosette rivets in excess of 10,000 times.

On June 23, 1989, he and several other officers were assigned to the Corvette Corrall, a Corvette show at the Bloomington fairgrounds. This is a large show with an excess of 50,000 visitors and 300 vendors. They toured the vendors, looking for stolen parts and other suspect conduct. Shumaker then obtained some money from headquarters and proceeded to defendant's booth. Defendant had a sign which stated he had rose-head rivets for sale at the price of two for $50. Shumaker explained that "rose head" is a street name for rosette rivets. Shumaker asked defendant if he had any rosette rivets for sale. Defendant answered affirmatively and explained these were genuine stainless-steel factory rosette rivets. Shumaker examined them and observed that they were, in fact, rosette rivets. He paid for them and then arrested defendant. Upon inquiry, defendant explained he purchased a bag containing 65 of these at a flea market in Lorraine, Ohio. The State rested.

Defendant's first witness was a 20-year police veteran with an interest in classic cars. He stated he had never heard of a rosette or rose-head rivet. He did acknowledge that the handling of cases involving altering or switching of VIN plates has become more of a specialty area in which he has not been involved. Defendant's wife and father-in-law testified concerning the purchase of the rivets at the flea market in 1983.

Defendant testified that he has been involved in the restoration of Corvettes for a number of years. Prior to that, he was a police officer for nine years. In 1983 he was not yet in the restoration business, but he was involved in sports-car racing. That summer, he went to the flea market in Ohio and purchased five bags of rivets at $2 per bag.

He was not interested very much in the bag with this type of rivets. He was looking for some large-headed rivets which he purchased. In response to the question of why he purchased the rivets in question, he explained, "I had recognized the rivets from having been a police officer and knew that they could be valuable."

Later, defendant ran an advertisement in a national magazine advertising a number of Corvette parts, including "snowflake" rivets, which he offered for $20 a pair. He called them that because they looked like a snowflake. He sold one pair, and the rest he brought with him to the Corvette Corrall. He referred to them in his sign as rose-head rivets because that is what the one buyer had called them earlier. In explaining the unusual markup of $50 per pair for the rivets, he explained that large markups in the Corvette restoration business are not unusual. He then testified to various examples of products he procured cheaply or for free, and the exorbitant prices he received for them. The first time he heard the phrase "rosette rivet" was when he was arrested.

On cross-examination, he stated that beginning in 1966 all Corvettes used rivets of this type to secure the VIN plates. He admitted knowing this type of rivet is used on Corvettes. He explained that one purpose of the Corvette Corrall was to certify Corvettes as being rebuilt using original parts or facsimiles. This certification could increase the value by $20,000. The car could obtain the certification if it used these rivets or reasonable facsimiles.

The jury found defendant guilty. The court, observing defendant had no prior record, placed defendant on a two-year conditional discharge and ordered him to pay a $300 fine. This appeal followed.

■ Defendant first raises several constitutional challenges to which some general principles apply. All statutes are presumed to be constitutional. (*People v. Bales* (1985), 108 Ill. 2d 182, 188, 483 N.E.2d 517, 519; *Sayles v. Thompson* (1983), 99 Ill. 2d 122, 124-25, 457 N.E.2d 440, 441-42.) The party challenging a statute has the burden of clearly establishing a constitutional violation. (*People v. O'Donnell* (1987), 116 Ill. 2d 517, 521, 508 N.E.2d 1066, 1068.) The supreme court has repeatedly emphasized that it is the court's duty to construe acts of the legislature so as to affirm their constitutionality and validity if it can reasonably be done, and, further, if their construction is doubtful, the doubt will be resolved in favor of the validity of the law challenged. *O'Donnell*, 116 Ill. 2d at 521-22, 508 N.E.2d at 1068; *Bales*, 108 Ill. 2d at 188, 483 N.E.2d at 520; *Continental Illinois National Bank & Trust Co. v. Illinois State Toll Highway Comm'n* (1969), 42 Ill. 2d 385, 389, 251 N.E.2d 253, 257.

Defendant first asserts the statute he was prosecuted under violates his due-process rights because it is unconstitutionally vague. Defendant observes a rosette rivet is not defined by statute or case law. Therefore, he maintains, it is impossible for a person to know if he possesses one and if he violates the statute.

■ ■ There are two requirements under the due-process-vagueness standard when the first amendment is not involved. (*Bales*, 108 Ill. 2d at 188, 483 N.E.2d at 520.) First, the statute must give a person of ordinary intelligence a reasonable opportunity to know what conduct is lawful or unlawful. (*O'Donnell*, 116 Ill. 2d at 522, 508 N.E.2d at 1068.) Second, the statute must provide standards to avoid arbitrary and discriminatory enforcement and application by police officers, judges, and juries. (*O'Donnell*, 116 Ill. 2d at 522, 508 N.E.2d at 1068.) The determination of whether a statute is void for vagueness must be made in the factual context of each case. (*Bales*, 108 Ill. 2d at 189, 483 N.E.2d at 520; *People v. Garrison* (1980), 82 Ill. 2d 444, 454, 412 N.E.2d 483, 488.) In such cases, the underlying requirement of due process is that an individual cannot be held to have violated a statute unless he could reasonably be expected to understand that his particular conduct was proscribed. *Garrison*, 82 Ill. 2d at 454, 412 N.E.2d at 488-89.

■ The statute in question reads:
"It is a violation of this Chapter for:
* * *

(5) A person to knowingly possess, buy, sell, exchange, give away, or offer to buy, sell, exchange or give away, any manufacturer's identification number plate, mylar sticker, federal certificate label, State police reassignment plate, Secretary of State assigned plate, rosette rivet, or facsimile of such which has not yet been attached to or has been removed from the original or assigned vehicle. The provisions of subsection (a) of this Section shall not apply to police officers while in official performance of their duties, or to a manufacturer's authorized representative who is replacing any manufacturer's identification number plate, mylar sticker or Federal certificate label by the manufacturer of the vehicle or any essential part thereof." Ill. Rev. Stat. 1989, ch. 95½, par. 4—103(a)(5).

■ It is a fundamental principle that in construing statutes, the judicial role is to ascertain and give effect to the intent of the legislature. (*O'Donnell*, 116 Ill. 2d at 522, 508 N.E.2d at 1068.) In seeking to determine legislative intent, a court should not read a particular provision in isolation, but rather must construe each provision in light

of this statute as a whole. (*O'Donnell*, 116 Ill. 2d at 523, 508 N.E.2d at 1068.) Thus, in *O'Donnell*, the court, while observing that the section in question standing by itself might be unconstitutional, used the entire drivers' licensing law to interpret the section and found it constitutional.

The possession of rosette rivets is proscribed in a section of the Code referred to as "Anti-Theft Laws" (Ill. Rev. Stat. 1989, ch. 95½, pars. 4—100 through 4—108). The purpose of these laws is to protect automobile owners against theft, and to protect the general public against the commission of crimes involving stolen automobiles. (*People v. One 1979 Pontiac Grand Prix Automobile* (1982), 89 Ill. 2d 506, 510, 433 N.E.2d 1301, 1302.) The rivets are specifically referred to in the section dealing with car identification numbers. Three of the five identification pieces named in the section use the word "plate" (manufacturer's identification number plate, State police reassignment plate, Secretary of State assigned plate). (Ill. Rev. Stat. 1989, ch. 95½, par. 4—103(a)(5).) A "rivet" is defined as a headed metal bolt used for uniting two pieces of metal by passing the shank through a hole in each, and then beating or pressing the plain end to form another head. (Webster's Ninth New Collegiate Dictionary 1018 (1989).) "Rosette" is defined as an ornament designed to resemble a rose. (Webster's Ninth New Collegiate Dictionary 1024 (1989); see also The American Heritage Dictionary 1071 (1982).) Thus, we find that by the use of the phrase "rosette rivet," the legislature intended it to mean the rose-headed rivet used to fasten these identification plates to the vehicles. This definition is further supported by the phrase "which has not yet been attached to or has been removed from the original or assigned vehicle," and by the next sentence, which excludes from coverage the manufacturer's representative who is replacing the identification numbers. Accordingly, we conclude that the statute has no vagueness problem.

Defendant next contends the penalty classification provided for the instant violation, a Class 2 felony (Ill. Rev. Stat. 1989, ch. 95½, par. 4—103(b)), is unconstitutional in that it violates the due process and proportionate penalty clauses of the Illinois Constitution. Ill. Const. 1970, art. I, §§2, 11.

The courts, while acknowledging that those sections place some restraint on the power of the legislature to establish penalties for crimes have, nonetheless, been reluctant to invalidate penalties prescribed by the legislature. (*People v. Steppan* (1985), 105 Ill. 2d 310, 319, 473 N.E.2d 1300, 1305.) It is well established that under the State's police power, the legislature has wide discretion to prescribe

penalties for defined offenses. (*People v. Morris* (1990), 136 Ill. 2d 157, 161, 554 N.E.2d 235, 236.) The legislature, institutionally, is more aware than the courts of the evils confronting our society and, therefore, more capable of gauging the seriousness of various offenses. *Steppan*, 105 Ill. 2d at 319, 473 N.E.2d at 1305.

▇▇ When reviewing a statute under the due-process clause (Ill. Const. 1970, art. I, §2), the test focuses on the purpose and objectives of the enactment in question. (*Morris*, 136 Ill. 2d at 162, 554 N.E.2d at 236.) The supreme court has required only that the penalty prescribed for the particular crime be reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety, and general welfare. *Morris*, 136 Ill. 2d at 162, 554 N.E.2d at 236; *Steppan*, 105 Ill. 2d at 319, 473 N.E.2d at 1305.

▇▇ The standard of review under the proportionate penalty clause (Ill. Const. 1970, art. I, §11) was stated in *People v. Gonzales* (1962), 25 Ill. 2d 235, 240, 184 N.E.2d 833, 835, quoting portions of *People ex rel. Bradley v. Illinois State Reformatory* (1894), 148 Ill. 413, 420-22, 36 N.E. 76, 79:

"This court has traditionally been reluctant to override the judgment of the General Assembly with respect to criminal penalties. It indicated at an early date that the constitutional command that 'penalties shall be proportioned to the nature of the offense' would justify interference with the legislative judgment only if the punishment was 'cruel,' 'degrading' or 'so wholly disproportionate to the offense committed as to shock the moral sense of the community.' "

▇▇ As noted earlier, the section in question is contained in article I, chapter 4, of the Code, which is entitled "Anti-Theft Laws" (Ill. Rev. Stat. 1989, ch. 95½, pars. 4—100 through 4—108). The purpose of these provisions is to protect the public by discouraging car theft, especially that done by organized rings. It is for this reason that the car-identification-number system and the use of VIN plates has developed. It is recognized that the absence of rosette rivets is the first indication in any investigation that something may be wrong with the vehicle. (See *People v. Suk* (1990), 220 Cal. App. 3d 952, 269 Cal. Rptr. 676; *State v. Bonner* (1986), 77 Or. App. 572, 714 P.2d 245; *State v. Sollars* (Mo. Ct. App. 1986), 706 S.W.2d 485; *Spears v. State* (1978), 38 Md. App. 700, 382 A.2d 616; *People v. Von Werne* (1977), 41 N.Y.2d 584, 362 N.E.2d 982, 394 N.Y.S.2d 183.) Accordingly, possession of these rivets would be of great value to car thieves as a first line of defense from detection. It is for this reason they are not available to the public. It is also this legitimate State interest which this

statute and its penalty are designed to correct. We conclude that since the possession of these rivets by unauthorized persons would defeat their salutory purpose, the authorized penalty is reasonably designed to remedy this problem. We find no violation of either the due-process clause or the proportionate-penalty clause of the Illinois Constitution. There is also no violation of the constitutional prohibition against cruel and unusual punishment. We acknowledge the possible penalty is severe. However, being mindful of the fact that the legislature is in a better position to gauge the seriousness of offenses and the necessary remedies, we conclude this is properly a legislative determination.

Defendant's final constitutional challenge is that the statute is unconstitutional because it violates the equal protection provisions of the Illinois Constitution. He notes that according to Shumaker's testimony, the type of rivets used on Toyotas manufactured in Japan are not rosette rivets, and possession of them is therefore not illegal. He maintains "[t]his classification that has arisen between people with GM rivets and others rests on grounds wholly irrelevant to the goal of eliminating organized vehicle thieves and their alteration of VIN plates."

The equal protection clause does not deny States the power to treat different classes of persons in different ways. *People v. Bradley* (1980), 79 Ill. 2d 410, 416, 403 N.E.2d 1029, 1031.

> "The standards under which this proposition is to be evaluated have been set forth many times by this Court. Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland* (1961), 366 U.S. 420, 425, 6 L. Ed. 2d 393, 398-99, 81 S. Ct. 1101, 1105.

Defendant believes the unequal treatment is between those possessing rivets used in cars built outside the United States and those possessing rosette rivets. However, the evidence establishes that all cars built in the United States, even those of foreign ownership, use the rosette rivets. Thus, the majority of cars use these rivets. Therefore, the classification is relevant to a valid State purpose, curtailing theft and resale, and defeats the constitutional challenge.

Defendant next asserts he was denied a fair trial by various court rulings.

First, he complains that Shumaker was an expert witness

and the State failed to disclose his status as such as is required by Supreme Court Rule 412 (107 Ill. 2d R. 412). He notes that noncompliance with discovery rules constitutes error when there is a showing of prejudice. *People v. Scheidt* (1986), 142 Ill. App. 3d 844, 847, 492 N.E.2d 248, 251.

 Initially, the record reveals that defendant did not raise this objection at trial, nor did he raise this specific argument in his post-trial motion. Accordingly, this issue is properly considered waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30.) Further, Shumaker was listed as a witness, and his reports and grand jury testimony were given to defendant on August 10, 1989. In *Scheidt* (142 Ill. App. 3d at 847-48, 492 N.E.2d at 251), the court stated:

> "It is difficult to see how defendant was prejudiced by this failure to disclose. He knew that the police officers would be testifying at trial. He also knew from other discovery the nature of the items seized from his person, his van and his house. It could not have come as a surprise that some or all of the officers would have experience in investigating bookmaking operations. For the same reasons, the failure to reveal qualifications was not prejudicial."

This analysis applies equally well to the current situation. There is no error.

Defendant next complains about the foundation of Shumaker as an expert. He does not believe the trooper's experience, which consisted "of a few police classes and a tour through a Chrysler plant," is sufficient to make him an expert.

 Expert testimony will be admitted if the expert has some knowledge or experience which will aid the court or jury in arriving at determinations on the issues and if the subject matter is sufficiently beyond the common experience. (*People v. Server* (1986), 148 Ill. App. 3d 888, 897, 499 N.E.2d 1019, 1025-26.) The indicia of expertise is not a given level of academic qualifications, but whether the expert has knowledge and experience beyond the average citizen which would assist the jury in evaluating the evidence. (*People v. Douglas* (1989), 183 Ill. App. 3d 241, 254, 538 N.E.2d 1335, 1343.) Irrespective of how specialized knowledge was acquired, whether through education, training, experience, or a combination of each, if the witness possesses such knowledge, he may testify. (*Douglas*, 183 Ill. App. 3d at 254, 538 N.E.2d at 1343.) This determination is directed to the sound discretion of the trial court and will only be disturbed when it constitutes an abuse of that discretion. *People v. Bradley* (1988), 172

Ill. App. 3d 545, 550, 526 N.E.2d 916, 920.

It is unclear from the record whether Shumaker was called as an expert or was testifying as the arresting officer who has had experience in this field. However, assuming he is an expert witness, a proper foundation has been laid. The evidence establishes that Shumaker has over 20 years with the State Police, has received special training and refresher courses, was taken to the Chrysler plant, and has seen in excess of 10,000 rosette rivets. This is sufficient.

Defendant next contends he was improperly limited in his cross-examination of Shumaker. Defendant asked Shumaker if he had ever arrested anyone in Illinois for possession of rosette rivets or rose-head rivets, and whether he had ever been involved in prosecution of a rosette-rivet case resulting in conviction before. In each case, an objection was sustained.

It is difficult to see how the fact that this may be the first rosette-rivet case Shumaker has involved in, or the fact there were acquittals in other cases, would be proper impeachment. The question is the ability of Shumaker to identify a rosette rivet. The fact a defendant has been acquitted has no direct bearing on that ability. There could be a number of reasons for the acquittal other than Shumaker's ability to properly identify a rosette rivet. If defendant wished to know if Shumaker had ever misidentified a rivet, he should have asked more directly.

Defendant's last assertion on this issue is that the court improperly prevented him from presenting exhibits to the jury. He specifically refers to defendant's exhibits which are pictures showing VIN plates and the rivets on two 1985 Toyotas. These pictures were used during the cross-examination of Shumaker, who testified that one picture was definitely not of a rosette rivet and that he could not tell on the other because the picture was not clear.

Defendant wished to introduce the pictures to show how similar those rivets are to the rosette rivets, as a means of attacking Shumaker's credibility. However, Shumaker had already stated they were not rosette rivets. Therefore, unless they were actually rosette rivets, they could not be beneficial in attacking his testimony. Since there was no evidence establishing that they were rosette rivets, it appears the pictures are not helpful to the jury for their asserted purpose. Since this foundation was missing, they were properly found inadmissible.

Defendant last argues he was denied a fair trial by defective jury instructions. He argues the instructions are deficient, in that they do not define the term "rosette rivet." Therefore, it is up to the

jury to decide what is or is not a rosette rivet.

The jury was presented ample evidence of what a rosette rivet is, and Shumaker identified the rivets in question as being such. The jury can rely on this evidence, just as it can when a forensic scientist testifies that a substance contains an illegal drug. There was no error in the instructions.

For the aforementioned reasons, the conviction and sentence of defendant Gary Steffens are affirmed.

Affirmed.

GREEN and McCULLOUGH, JJ., concur.