THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHRIS D. SOLER, Defendant-Appellant.

First District (6th Division)   No. 1—90—1854

Opinion filed April 3, 1992.

Paul Bradley, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Michael J. Pugh, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Following a bench trial, defendant, Chris D. Soler, was convicted on two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(c)) and received concurrent terms of four years' probation.

On appeal, defendant contends that (1) his convictions should be reversed because the State produced insufficient evidence to prove him guilty beyond a reasonable doubt, (2) the trial court erred in refusing to consider certain evidence presented by him, and (3) the trial court erred in denying his motion *in limine* to exclude the testimony of the complainant's sister.

The record reveals that defendant was charged in two separate indictments with three counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(c)). Indictment 89—CR—19860 asserted that between February 1, 1986, and July 31, 1986, defendant, a person over 17 years of age, fondled the breasts of the complainant, K.M., a person under 13 years of age. Indictment 89—CR—19861 asserted that between July 1, 1986, and July 31, 1988, defendant, a person over 17 years of age, committed two acts of improper sexual conduct upon the complainant, a person under 13 years of age. Count I alleged that defendant rubbed the vagina of the complainant with his hands, and count II alleged that defendant rubbed the breasts of the complainant with his hands.

Following a bench trial, defendant was convicted of the offenses charged by indictment 89—CR—19860 and by count II of indictment 89—CR—19861, both of which alleged that defendant had touched the breasts of the complainant. The trial court found defendant not guilty of the charge presented in count I of indictment 89—CR—19861, which alleged that defendant had touched the vagina of the complainant. Defendant received concurrent terms of four years' probation.

The evidence adduced at trial established that during their marriage, Kevin M. and Alice M. had three children. The complainant, K.M., born July 10, 1975, was the eldest. The couple also had a son, S.M., and another daughter, M.M. At the time of trial, complainant was 14 years old, S.M. was nine years old, and M.M. was eight years old. Kevin M. and Alice M. divorced in 1984. After their divorce, Kevin M. and Alice M. had joint custody of their children, who divided their time between the homes of their father and mother. In September of 1985, Kevin M. remarried. His second wife, Christina, had two children born during a previous marriage. In June of 1986, Alice M. married the defendant and took the surname of Soler.

The complainant testified that until September 1988, she resided at various locations along with her mother, the defendant, her brother, S.M., and her sister, M.M. In June 1986, complainant lived with her mother and her siblings in a home on Kirkwood Avenue in Chicago, Illinois. After the marriage of defendant to Alice Soler, defendant moved into that home on Kirkwood Avenue. Approximately one month later, defendant, Alice Soler, complainant, and her siblings moved to a house on Tinker Way in Glenview, Illinois. A few months later, they moved to another house on Mohawk Lane in Glenview, Illinois. In September of 1988, they moved to a home in Hinsdale, Illinois. Approximately one week later, complainant moved into her father's home in Northfield.

Complainant testified that after his marriage to Alice Soler, defendant refused to answer the children unless they called him "Popi" or "Dad." Consequently, at defendant's insistence, complainant and her siblings referred to defendant as "Popi." Complainant explained that she and her siblings referred to Christina, their father's second wife, as "Marmy," a name which had been made up by M.M. as a way of distinguishing Christina from their mother. Complainant indicated that the children voluntarily called Christina "Marmy," but were forced to call defendant "Popi."

Complainant testified that when defendant began dating her mother, complainant liked him and felt that he was nice and fun. She acknowledged on cross-examination that she had been affectionate with defendant during this time. Complainant stated, however, that her feelings toward defendant changed after he sexually abused her. Complainant stated further that defendant teased her and her siblings and played practical jokes on them and that, although their mother observed this behavior, she did nothing to stop it.

Complainant described the family's habit of gently rubbing another's arms, legs, torso, back, face, and shoulders in a casual way.

The family referred to this conduct as "nicing," and complainant stated that it began before defendant ever came into their lives.

Complainant testified that the first incident of sexual abuse by the defendant occurred approximately one month after defendant married Alice Soler and while they lived in the house on Kirkwood Avenue in Chicago. Complainant stated that one evening when she and defendant were alone in the family room watching television, defendant came up to her and said he was going to "nice" her. He began by rubbing complainant's arm and then started rubbing her stomach. He then moved up underneath her shirt and rubbed her chest and breasts. Defendant asked complainant whether she liked it while he rubbed her bare skin with his hands. Complainant testified that she was 10 years old when this incident occurred and that she was not yet developed as a woman.

Complainant stated that after they moved to the home on Tinker Way in Glenview, defendant sometimes came into her bedroom at night and touched her bare chest and breasts underneath her pajamas. These incidents occurred while S.M. and M.M. were asleep in the same room. Complainant indicated that defendant would be in her bedroom doing this for approximately one-half hour. Complainant testified further that on another occasion, defendant began rubbing her vaginal area which she described as "not exactly like where I go to the bathroom but a little bit above, between my legs." When defendant did this, he put his hand underneath complainant's underpants and touched her bare skin.

Complainant stated that she told her mother about this incident a couple of days after it occurred and approximately one month after the first incident which took place in the Kirkwood Avenue home. Complainant testified that she told her mother that defendant had been touching her on her breasts and under her pants and that she did not like it. She attempted to show her mother how defendant had touched her, but she became very embarrassed, started crying, and stopped. Complainant testified that her mother responded by saying "[a]re you sure? You better not be lying to me because things like this can break up a marriage. I just don't want him to leave. [I]f he's doing this to you, I will have to separate." Complainant told her mother that she was telling the truth, and her mother said that she would talk to defendant.

Complainant testified that her mother subsequently told her that defendant was astonished by her claim that he had touched her in a sexual manner and said that he was only "nicing" her, that he didn't mean to make her feel uncomfortable, and that he would never do it

again. Complainant stated that defendant did not touch her for about one month, but he then began doing it again. Complainant testified that she did not tell her mother about these subsequent incidents because "she didn't make it stop the first time." Complainant stated further that during a family trip to Wisconsin, defendant put his mouth on her breasts.

Complainant also testified that she did not tell her father about defendant's conduct and that she did not tell Rosemary Schultz, the family therapist, because Ms. Schultz had previously indicated that she would be required to report any incidents of abuse and because complainant "did not want everyone to know."

Complainant testified that on August 3, 1989, she went to lunch at Water Tower Place with her sister, M.M., her stepmother, and her stepsister. Complainant stated that during this outing, M.M. told complainant and their stepmother that defendant had touched her in a sexual way. Complainant stated that she and M.M. began to cry and that she hugged M.M. "because [she] felt so bad for her." Complainant then told her stepmother that defendant had been touching her for three or four years. Complainant testified that her stepmother called her father and relayed to him what she had said. After her father came home from work that evening, complainant told him that defendant had been touching her, and she was present when he called Rosemary Schultz, their family therapist, to make an appointment for complainant the following day.

On cross-examination, complainant denied that she ever requested that defendant "nice" her or come into her bedroom after she told her mother about the incidents of abuse. Complainant testified that she did not cry out to her mother when defendant abused her because defendant had a very bad temper and she was afraid to tell anyone.

Complainant stated that she liked her stepmother very much and that it felt more like a family at her father's house than at her mother's house after the divorce and before defendant moved in. Complainant also stated on cross-examination that her mother did not take care of S.M. or M.M. when they got hurt and that complainant felt she should take her mother's role and help the younger children to feel better. Complainant indicated that she took the role of a mother to her younger brother and sister and that she felt at that time that she was a better mother to them than Alice Soler was. Complainant testified that the main reason for her desire to live with her father was because of the sexual abuse by the defendant. She stated further that other reasons included conflicts she was having with her mother. Complainant stated that after she moved in with her father in Sep-

tember 1988, she wanted S.M. and M.M. to come and live with her there, but she did not mention this to them.

Complainant acknowledged that she sided with her father in the custody dispute between him and her mother. Complainant testified that while she spoke with a guardian appointed to represent her in the custody dispute, all she could think about was the way her mother had failed to protect her from the defendant's conduct. Complainant acknowledged, however, that she did not tell the court-appointed guardian about the sexual abuse by the defendant, and she stated that she was angry with her mother at that time.

Complainant indicated that after defendant married Alice Soler, he began setting down rules and became the disciplinarian of the house. Complainant stated that she did not like the defendant taking the role of a father because she already had a father, but testified that "[she] didn't feel that much hate toward him becoming [her] father at that time."

On redirect examination, complainant testified that she had attempted to tell a friend about the sexual abuse by the defendant, but she was embarrassed and afraid to tell other people.

Complainant testified that after M.M. told their stepmother that she had been sexually abused by defendant, complainant was prompted to reveal that defendant had sexually abused her for several years. Complainant explained that she decided to tell others of the abuse she had suffered because "since they knew about [M.M.], [complainant] could tell. Whatever was going to happen, could happen."

Complainant testified that on July 20, 1989, she wrote a seven-page letter to her mother in which she described several problems with and complaints about her relationship to her mother. When questioned as to why she did not mention defendant's sexual abuse in this letter, complainant stated "[b]ecause it was already practically four years since he had done it. And at that point I decided I wasn't going to tell anyone. And I didn't want to write about it or tell anyone. I didn't even want to think about it. So, when I was writing about it, I don't even think I was thinking about putting it in."

Dr. Rosemary Schultz testified that she was a clinical psychologist and that her practice focused on children and family services. Schultz stated further that she had previously worked with approximately 70 to 75 children who were the victims of sexual abuse.

Schultz testified that prior to trial, she had treated the complainant for approximately seven years and had treated M.M. for approximately four years. Schultz began treating complainant to determine whether there were any adverse effects resulting from the divorce of

her parents. When Schultz first began treating complainant, she exhibited signs of anxiety which were equivalent to a level two according to the Diagnosis and Statistics Manual, Third Edition (DSM3), a manual published by the American Psychiatric Association and used by mental health professionals to describe a variety of symptoms and to diagnose mental disorders.

Schultz testified further that approximately two years prior to trial, she noticed a change in the complainant's personality and behavior, the symptoms of which were equivalent to a level six as set forth in the DSM3. Schultz stated that complainant's symptoms at this time were markedly different from those exhibited at the time of her parents' divorce and that, according to the DSM3, a level six would not be associated with a custody battle. Schultz explained that complainant was not as spontaneous; her eye contact was poor; she was withdrawn and isolated; and she had difficulty concentrating, in addition to exhibiting other symptoms. Schultz diagnosed complainant as having an adjustment disorder with mixed emotional features and a delayed onset of post-traumatic stress syndrome. Schultz stated that a delayed commencement of the symptoms of post-traumatic stress syndrome was not unusual.

Schultz testified on cross-examination that she received a telephone call from complainant's father during the evening of August 3, 1989, and that he said he was concerned about the possibility that M.M. might have been sexually abused. Schultz stated further that complainant's father also said that he had a suspicion that complainant might have been abused; "[w]e don't know about [complainant]."

Schultz testified that on August 4, 1989, complainant identified the event that triggered the post-traumatic stress syndrome by telling Schultz that she had been touched and hurt by her stepfather. Complainant told Schultz that defendant had touched her "low but not inside." Schultz concluded that defendant had touched complainant's lower abdominal region, but did not touch her vaginal region. When questioned as to whether complainant said defendant had touched her breasts, Schultz said that she could not recall. Schultz indicated that it seemed as though she would have included it in her report if complainant had made such a statement. Schultz acknowledged that her report did not reflect that complainant said defendant had touched her breasts.

On cross-examination, Schultz stated that of the 40 patients she treated in private practice, seven were related to complainant's father. Schultz was aware complainant's father wanted full custody of the children as early as July or August 1989, and she prepared notes

because she knew she might have to testify at a custody proceeding. Schultz stated, however, that she did not keep notes at the request of complainant's father or stepmother, but because both complainant and M.M. had made complaints of sexual molestation. Schultz stated further that complainant did not exhibit an extreme or severe level of the symptoms of sexual abuse or post-traumatic stress syndrome prior to August 4, 1989.

Schultz stated that complainant was very protective of S.M. and M.M. and described her relationship to them as "an animal fighting for her young." Schultz acknowledged that if complainant's allegations were true, she, knowing that defendant was a child molester, moved into her father's home in July 1988 and left M.M. and S.M. to stay in defendant's house several days each week. Schultz stated, however, that complainant was too frightened to tell anyone about this situation. Schultz stated further that complainant liked defendant when he first began dating her mother. After their marriage, however, she voiced several complaints about defendant but never mentioned sexual abuse. Schultz indicated that when complainant decided to live with her father full time, she told Schultz that she (complainant) would be a better mother for S.M. and M.M. than Alice Soler was.

Schultz testified that she had treated complainant's sister, M.M., for four years, beginning after her parents' divorce. Schultz began noticing changes in M.M. during the summer prior to trial. Schultz stated that M.M. appeared insecure, she cried more, would wake at night and look for her mother and father, and she would stand in her room and reassure herself that there was not a man in her room. On August 4, 1989, M.M. told Schultz that defendant had sexually abused her on two occasions by touching her bare breasts, stomach, and the area below her stomach. When Schultz asked M.M. to demonstrate defendant's conduct using a Raggedy Ann doll, M.M. touched the stomach of the doll. When Schultz pointed to the area between the legs of a Raggedy Ann doll, M.M. indicated that defendant had not touched her there.

Schultz diagnosed M.M. as having an adjusting disorder and post-traumatic stress syndrome with symptoms which were of the same level of severity as those of complainant. Schultz determined that sexual abuse by defendant triggered M.M.'s symptoms of post-traumatic stress syndrome. Schultz testified further that she received a telephone call from complainant's father while she was in a treatment session with M.M. on August 9, 1989. During that telephone conversation, complainant's father told Schultz that he had obtained custody of

the children and that they would be coming to live with him. When Schultz relayed this information to M.M., she threw up her hands and said "yeah." After Schultz told M.M. she might not be able to see her mother, M.M. said "yeah" again and cheered. Schultz testified that M.M. thereafter made an accusatory statement indicating that her mother did not satisfy her needs, primarily nurturing, protection, and attention.

Schultz testified that throughout all of their sessions since August 4, 1989, neither complainant nor M.M. varied her description of the defendant's conduct.

Complainant's eight-year-old sister, M.M., testified that she was sexually abused by defendant on July 31, 1989. She stated that while she and defendant were alone in the family room watching television, she requested that defendant "nice" her. At first, defendant rubbed M.M.'s arm, but he then moved his hand through an armhole and under her shirts and touched her bare breasts. M.M. indicated that she was wearing biking pants, a T shirt, and a loose fitting shirt with "hoops under the armpits." She testified that she did not say or do anything, but because she felt uncomfortable, she told defendant he could "nice" her on her stomach. M.M. testified that after defendant began to "nice" her on the stomach, he moved his hand onto her "pelvis" as he "pulled [her] pants up *** off [her] stomach." M.M. stated that her "pelvis" was "right above where I go to the bathroom." M.M. testified further that defendant placed his hand for 10 or 15 minutes on her right groin area, moving his hand from side to side. M.M. stated that while defendant had his hand on her right groin area she held a pillow over her head and thought to herself "I'll tell Marmy and Dad when I get home."

M.M. testified further that defendant quickly pulled his hand out of her pants when Alice Soler and S.M. returned home. M.M. stated that she then ran to her mother but did not tell her what had happened because "[she] was scared she wouldn't do anything." M.M. stated that this was the first time that defendant ever touched her in a way that made her feel uncomfortable, and she told her stepmother about the incident the following day. M.M. indicated that she did not see complainant that day but told complainant about the incident the next day.

On cross-examination, M.M. testified that she sometimes pulled her shirt up and requested to be tickled or "niced." She stated, however, that growing older made her sensitive about her chest. M.M. acknowledged that defendant did not touch her genital area but touched "right above it." M.M. stated that she became aware of the issue of

sexual abuse because sometime in the previous two years her father showed her and her siblings a videotape about "bad touches" and about adults who want to touch young children. M.M. testified that she did not know why she thought her mother would not do anything if she told her about defendant's conduct, and M.M. stated that her mother did not ignore her most of the time. On redirect examination, M.M. testified that she would not lie about defendant's conduct in order to live with the complainant.

Alice Soler testified on behalf of defendant. She stated that in 1986, complainant's father instituted court proceedings over the issues of custody and visitation. The couple participated in court-ordered mediation, and the case was continued over a long period of time. Alice Soler testified that there were at least 10 meetings with the mediator and that the relations between defendant and complainant's father became strained. Complainant's father instituted further court proceedings in 1987, and the conflict over custody and visitation remained unresolved. In September of 1988, shortly after Alice Soler and the defendant moved to Hinsdale from Glenview, complainant chose to live with her father. Mrs. Soler testified that when she first married defendant, he got along very well with complainant but later, when defendant took over the role of parent, complainant disputed his authority.

Alice Soler testified that the practice of "nicing" had originated in her family when she and her sister were children and consisted of gentle massage of the children on their arms, legs, backs and stomachs. Mrs. Soler stated that this practice continued into her first marriage and into her marriage with defendant. She stated that it was not unusual to "nice" the children on their bare skin and indicated that M.M. would pull her shirt over her head when she wanted to be "niced" on the back or stomach.

Mrs. Soler testified that sometime in the first seven months of her marriage to defendant, complainant told her that defendant had touched her and made her feel uncomfortable. Mrs. Soler stated that complainant never said that defendant had touched her breasts or genital area or that he had touched her underneath her clothing. Mrs. Soler stated that complainant indicated to her that defendant had "niced" her below the navel. Mrs. Soler acknowledged that it would be inappropriate and not a part of "nicing" for defendant to put his hands down the pants of her daughter or to intentionally touch her in the breast area. Mrs. Soler testified that when complainant told her of defendant's conduct, Mrs. Soler's first comment was "[o]h my God,

I could not believe it." According to Mrs. Soler, complainant's response to that comment was "I knew you wouldn't believe me."

Mrs. Soler testified further that after her conversation with complainant, she was concerned that complainant felt something inappropriate had happened. Mrs. Soler later spoke to defendant and told him that complainant said his "nicing" made her feel uncomfortable. She stated that she probably asked defendant whether he had touched complainant in a sexual manner. Defendant responded that he could not believe it; he was just "nicing" complainant like he had always done and that he did not mean to make her feel uncomfortable. Mrs. Soler testified that defendant was "absolutely horrified" when she confronted him with complainant's allegation. Defendant said that he would not "nice" complainant anymore, and Mrs. Soler then conveyed defendant's response to complainant. When Mrs. Soler asked complainant whether she was satisfied and felt okay, complainant said "yes." Mrs. Soler testified that defendant stopped "nicing" complainant for a while, but that several months later complainant again requested that defendant "nice" her.

Mrs. Soler also testified about the events involving M.M. on July 31, 1989. She stated that the family celebrated S.M.'s birthday that evening and that when she and S.M. left the house to buy items for the party, M.M. went outside to play. Mrs. Soler stated further that when she and S.M. returned from the store, there was nothing unusual about M.M.'s behavior and that she ran to the kitchen and wanted to know what kind of cake they had bought for S.M.'s birthday. Mrs. Soler indicated that M.M. then went right back into the family room and showed defendant a book that her mother bought for her while at the store.

Mrs. Soler testified that she loved the defendant and wanted to believe that he had not sexually abused her daughters. She testified that prior to trial, she had only two conversations with M.M. regarding the sexual abuse by defendant and that she discontinued these conversations at the request of a representative from the Department of Children and Family Services. According to Mrs. Soler, when she asked M.M. about defendant's touching her breasts, M.M. said "[h]e was just tickling me. And I think he accidentally touched me there." Mrs. Soler explained to M.M. the significance and importance of what she had said about defendant.

Mrs. Soler testified that after August 4, 1989, she never had an opportunity to speak with complainant about her accusations against defendant. Mrs. Soler indicated that the only reference complainant made to her occurred when they were leaving the courtroom during a

civil proceeding. At that time, complainant screamed at her, "[h]ow could you believe him; you don't believe me; I hate you because you never did anything for me."

Dr. Beth Huebner, a clinical psychiatrist and qualified expert in sexual abuse, testified that she met with M.M. a total of 12 separate times. Huebner prepared a report of her findings on November 30, 1989, and as of that date, she had seen M.M. six times. Huebner met with M.M. six more times after November 30, 1989. Huebner stated, however, that nothing in her diagnosis of M.M. changed after November 30, 1989, and consequently, there was no reason to alter her report to include information obtained during the last six meetings. Huebner indicated that she stopped seeing M.M. after she received letters from complainant's father which referred to legal consequences if she continued to meet with M.M.

During a meeting with M.M. on October 24, 1989, Huebner questioned M.M. about the incident of abuse that M.M. alleged occurred on July 31, 1989. When Huebner asked M.M. to demonstrate defendant's conduct using an anatomically correct doll, M.M. indicated that defendant had touched her on her stomach but did not touch her in the genital area. Huebner stated that M.M. said she had never told her stepmother that defendant had touched her between the legs. Huebner testified that M.M. never altered or varied her statement regarding genital touching. Huebner stated further that M.M. indicated that she felt the defendant intended to establish genital contact, but he did not do so "because he knew it was bad."

Huebner testified that M.M. was unusually physical toward her and "really trespassed beyond appropriate boundaries with a stranger." Huebner stated M.M. told her that at times she wanted to go and live with her father, and Huebner indicated that M.M. was very cognizant that an allegation of sexual abuse could lead to a change of custody to her father.

Huebner testified that she did not believe M.M. had been sexually abused because she did not have the profile of an abused child; had no regressive behaviors; and no apparent reluctance to be left at home with defendant. Huebner indicated further that M.M. had set up the situation and became upset when her contrived allegations got out of hand. Huebner stated that she believed that M.M. was very manipulative.

On cross-examination, Huebner testified that when using the anatomically correct doll, M.M. indicated that she was touched in the area below the belly button but not at the vaginal opening. Huebner

stated that M.M. never drew back from that description of defendant's conduct.

Huebner testified that she believed that defendant had put his hands down M.M.'s pants, but Huebner believed that did not necessarily mean that M.M. had been molested. Huebner also stated that the mere fact that M.M. did not immediately inform her mother of defendant's conduct did not mean that the sexual abuse did not occur and that a child's reaction to sexual abuse will vary according to the child's personality.

Defendant, testifying on his own behalf, stated that he never touched complainant or M.M. in a sexual manner or with the intent to arouse them sexually or himself sexually. He stated that after complainant spoke to her mother about defendant's conduct, he stopped "nicing" her for a while, but several months later, complainant again requested that he "nice" her. Defendant testified he felt that if he refused to "nice" complainant when she asked him to, he would be punishing her for what she had said to her mother.

Defendant testified further that on July 31, 1989, M.M. lay beside him on the couch and requested that he "nice" her. Defendant stated that he rubbed M.M.'s arms, legs, shoulders, and stomach, but he never put his hand inside her pants.

The parties stipulated that if called as a witness, Dr. Jeffrey S. Spector, M.D., an expert in the field of child psychiatry, would testify that from October 5, 1989, through January 5, 1990, he conducted a series of interviews with complainant, M.M., S.M., complainant's mother, her father, and her stepmother. Spector conducted these interviews both individually and in family group sessions. Spector also consulted with Dr. Huebner by telephone, received a letter from Alice Soler's therapist, and reviewed the materials provided by Dr. Schultz with respect to complainant, M.M., and S.M.

The parties stipulated further that Spector would testify that both complainant's and M.M.'s forms of disclosure and nondisclosure were consistent with each of their personalities. The terminology used by both girls was age appropriate, and these two girls were not sexually preoccupied. Both girls told a consistent story, and they appeared to be credible. All three children were concerned about the failure of their mother to protect them.

The parties stipulated that Spector concluded that all three children should remain with their father because the importance of safety and stability was paramount. Complainant and M.M. had made a shift to their father's family as a source of comfort and protection from their anxieties. This was necessary for their emotional well-being and

psychological, social, and physical development. Denial of their anxieties would be a disservice to them.

Detective Daniel Callahan testified that he was a criminal investigator for the Du Page County State's Attorney's office in the child molestation unit. Callahan stated that on August 3, 1989, he received a telephone call from Detective Joe Gerrick of the Hinsdale police department, who informed him of an allegation of aggravated criminal sexual assault upon M.M. Approximately one-half hour later, Callahan telephoned complainant's father and obtained additional information about the incident involving M.M. and defendant.

Callahan testified further that on August 10, 1989, he interviewed defendant and informed him that M.M. asserted that on two separate occasions he had touched her in an inappropriate manner. Callahan placed defendant under arrest and advised him of his *Miranda* rights. Callahan stated that after defendant waived his *Miranda* rights, he said, "Why didn't she say something after the first time?" Callahan testified that defendant also said M.M. "[was] truthful; she [didn't] lie; she [didn't] make things up."

Upon consideration of the evidence presented and the arguments of counsel, the trial judge found defendant guilty of the crimes charged by indictment 89—CR—19860 and by count II of indictment 89—CR—19861, both of which alleged that defendant had touched the breasts of the complainant. Although the trial judge found the testimony of the complainant credible, she held that the evidence was insufficient to establish that defendant had touched the vagina of the complainant, and defendant was acquitted of the charge contained in count I of indictment 89—CR—19861.

In entering her ruling, the trial judge found the testimony of both complainant and M.M. credible. The judge stated further that the testimony of M.M., which described conduct identical to that described by complainant, not only corroborated the testimony of complainant, but showed a common pattern engaged in by defendant.

The trial court sentenced defendant to concurrent terms of four years' probation. He has appealed both convictions.

Defendant initially contends that the State presented insufficient evidence to prove him guilty beyond a reasonable doubt. In support of this contention, defendant cites several cases which have held that a conviction for sexual assault or abuse, where the defendant denies the charges, will be upheld only where there is either some corroboration of the testimony of the complaining witness or where the testimony of the complaining witness is otherwise clear and convincing. See *People*

*v. Kolden* (1962), 25 Ill. 2d 327, 185 N.E.2d 170; *People v. Seaver* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019.

We note, however, that the Illinois Supreme Court recently rejected this special standard of review that had been employed only in sex-offense cases. In *People v. Schott* (1991), 145 Ill. 2d 188, 582 N.E.2d 690, the supreme court held that the reasonable doubt test, as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, should govern an appellant's claim of evidentiary insufficiency in all criminal cases, including those involving sex offenses. (*Schott*, 145 Ill. 2d at 202-03.) Consequently, the reasonable doubt test articulated in *Collins* must be applied in reviewing defendant's claim that the State produced insufficient evidence to support his convictions.

Under the reasonable doubt test, criminal convictions are not to be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*Collins*, 106 Ill. 2d at 261.) A court of review must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■ In the instant case, the trial court found the evidence established that defendant had on at least two occasions touched the breasts of the complainant, and defendant was convicted of two counts of aggravated criminal sexual abuse. Defendant has asserted that the testimony of the complainant was insufficient to support these convictions.

As noted above, the testimony of the complainant need not be corroborated and need not be clear and convincing. Rather, the complainant's testimony, when viewed in the light most favorable to the prosecution, must support a finding by a rational trier of fact that the essential elements of the crime were proved beyond a reasonable doubt. *Schott*, 145 Ill. 2d at 203; *Collins*, 106 Ill. 2d at 261.

The complainant in the case at bar testified clearly and in great detail as to the specific acts of sexual abuse committed by defendant. She stated that the first incident occurred one evening when she and defendant were alone in the family room of the home on Kirkwood Avenue in Chicago. Complainant testified that defendant told her he intended to "nice" her and, after rubbing her arm and stomach, he moved his hand underneath her pajama top and touched her bare chest and breasts. While defendant was touching complainant in this manner, he asked her whether it felt good and whether she liked it.

Complainant also testified that on other occasions, after defendant had begun to "nice" her, he then touched her bare chest and breasts and the skin beneath her underpants in the area between her legs. These incidents occurred in the home on Tinker Way in Glenview and took place at night when defendant spent as much as one-half hour in the bedroom complainant shared with her siblings.

Complainant stated further that after she told her mother about these incidents, he stopped touching her for approximately one month but then resumed this conduct. Complainant testified that she had attempted to tell a friend about these incidents, but she became embarrassed. Complainant stated further that she did not tell anyone else about the defendant's conduct because she was frightened. The complainant's testimony was given without hesitation or equivocation, and the trial judge found it to be credible.

The testimony of Dr. Schultz substantiated that of the complainant in that Schultz diagnosed complainant as having an adjustment disorder with mixed emotional features and post-traumatic stress syndrome. Schultz concluded that the event that triggered the post-traumatic syndrome was the sexual abuse by defendant. Schultz stated that complainant's symptoms were equivalent to a level six as classified by DSM3, as opposed to the level two symptoms which Schultz had observed in complainant during the divorce of her parents. Complainant explained that she did not tell Schultz of the defendant's acts of sexual abuse until August 1989, because Schultz had previously indicated that she would be required to report any incidents of abuse. Schultz testified that it was not unusual that complainant did not tell her about the sexual abuse and that complainant "did not feel her mother would be open to any criticism of the defendant."

Complainant's testimony was also substantiated by the testimony of M.M., complainant's eight-year-old sister, who stated that on July 31, 1989, at her request, defendant began to "nice" her arm but then proceeded to put his hand under her shirt and touched her bare breasts. After M.M. told complainant about this incident during a luncheon outing with their stepmother, complainant was prompted to tell her father and her stepmother that defendant had sexually abused her for several years. Complainant explained that she decided to tell others of the abuse she had suffered because "since they knew about [M.M.], [complainant] could tell, whatever was going to happen, could happen."

Dr. Spector concluded that complainant's form of disclosure of the abuse was consistent with her personality and that she appeared to be credible.

The trial judge held that the evidence established that defendant touched the breasts of the complainant on at least two occasions. Accordingly, the judge found defendant guilty of two counts of aggravated criminal sexual abuse.

Contrary to defendant's argument, the complainant's testimony cannot be rejected merely because she did not tell anyone but her mother about these incidents until August 1989. The complaint by a victim of a sex offense need not be made within a definite time limit (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25), and a delay in reporting incidents of sexual abuse may be reasonable where the victim's silence can be attributed to fear of the offender or to shame, guilt, and embarrassment felt by the victim (*People v. Escobedo* (1986), 151 Ill. App. 3d 69, 83, 502 N.E.2d 1263, 1272). Under such circumstances, a delay of several months in reporting incidents of sexual abuse will not detract from the reasonableness of a complainant's testimony. (*Escobedo*, 151 Ill. App. 3d at 82-83, 502 N.E.2d at 1272.) When the age of the complainant is considered along with the nature of the crime committed by defendant, it is not unreasonable to infer that the complainant would be hesitant or afraid to reveal the details of the conduct she suffered. *People v. Hood* (1974), 59 Ill. 2d 315, 319 N.E.2d 802.

Defendant also asserts that complainant was impeached by omission in her letter to her mother dated July 20, 1989, because the letter made no mention of sexual abuse by the defendant. Yet, the record indicates that the letter was written after complainant had moved in with her father and was, presumably, safe from further abuse by defendant. In addition, complainant wrote the letter to her mother well after her mother had already indicated that she did not believe complainant's statement that defendant had abused her. Moreover, complainant explained that she did not include complaints about defendant's conduct in the letter because it had occurred four years earlier and because she did not want to write or to think about it.

In a bench trial, it is the province of the trial court to judge the credibility of witnesses, to determine the weight to be accorded their testimony, and to draw inferences from the testimony. (*People v. Jarvis* (1987), 158 Ill. App. 3d 415, 511 N.E.2d 813; *People v. Purnell* (1984), 126 Ill. App. 3d 608, 467 N.E.2d 1160.) In the case at bar, the trial judge found the testimony of complainant credible and specifically stated that the evidence against defendant was unrefuted and unrebutted. The court also took particular note of the complainant's testimony that she told no one other than her mother about the defendant's conduct because she was afraid.

Even before the supreme court issued its decision in *Schott*, Illinois courts consistently held that a complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect in order to sustain a conviction for sexual abuse. (See *People v. Douglas* (1989), 183 Ill. App. 3d 241, 251, 538 N.E.2d 1335, 1341; *People v. Findlay* (1988), 177 Ill. App. 3d 903, 911, 532 N.E.2d 1035, 1041; *People v. Henne* (1988), 165 Ill. App. 3d 315, 323, 518 N.E.2d 1276, 1281.) Where minor inconsistencies or discrepancies exist in a complainant's testimony but do not detract from the reasonableness of her story as a whole, the complainant's testimony may be found to be adequate to support a conviction for sexual abuse. *Douglas*, 183 Ill. App. 3d at 252, 538 N.E.2d at 1341; *Findlay*, 177 Ill. App. 3d at 911, 532 N.E.2d at 1041.

We hold that the evidence in the record supports the trial court's finding that defendant was guilty beyond a reasonable doubt of two counts of aggravated criminal sexual abuse.

We next address defendant's assertion that the trial court erred in refusing to consider certain evidence presented by him. Specifically, defendant argues that the court erred in refusing to consider certain portions of the testimony of Dr. Schultz which defendant believed supported his claim that the complainant had lied about the nature of his conduct.

The record reveals that complainant testified that after she told her stepmother on August 3, 1989, that defendant had sexually abused her, her stepmother telephoned complainant's father at work and informed him of what complainant had said. According to complainant, her father then called "some people." Complainant stated further that when her father returned home from work that day, she repeated to him what she had earlier told her stepmother about the incidents of sexual abuse by defendant. Complainant subsequently testified that she was present when her father telephoned Dr. Schultz and made an appointment for complainant to speak with Schultz the following day. Complainant indicated that this call was made after she had told her father "the stuff."

Dr. Schultz testified on cross-examination that she received a telephone call from complainant's father during the evening of August 3, 1989, and that he said he was concerned about the possibility that M.M. might have been sexually abused. Schultz stated further that complainant's father also said that he had a suspicion that complainant might have been abused and said "[w]e don't know about [complainant]."

In his motion for a judgment of acquittal at the close of the State's case, defense counsel argued that if complainant had testified truthfully, her father would have known that she had been abused and would not have said to Schultz that he had a suspicion that complainant might have been abused or "[w]e don't know about [complainant]." Defense counsel urged that this testimony by Schultz contradicted and impeached the testimony of complainant.

The trial judge held that although the prosecutor failed to object to this testimony, it was hearsay and, accordingly, was inadmissible. The trial judge held further that even if she were to consider this testimony by Schultz, she would find that it had not sufficiently repudiated the evidence presented by the State to warrant a directed finding in favor of the defendant.

■ On appeal, defendant contends that the court erred in holding that this testimony by Schultz was inadmissible hearsay. In support of this contention, defendant initially asserts that Schultz' testimony was admissible because no objection was raised by the prosecutor at the time the testimony was elicited. This argument is without merit.

In a bench trial, the court is presumed to have considered only competent evidence. (*People v. Reed* (1991), 209 Ill. App. 3d 575, 568 N.E.2d 334.) The trial judge has wide discretion in controlling the proceedings and may, on her own motion, exclude irrelevant matter and confine the trial to the issues. (*People v. Martin* (1974), 24 Ill. App. 3d 710, 321 N.E.2d 368.) A trial court, sitting without a jury, is not required to consider incompetent and immaterial evidence, despite the fact that it was admitted into the case. (*In re Petition of Radtke* (1912), 171 Ill. App. 462.) Consequently, the trial judge in the instant case acted within her authority and discretion by ruling that Schultz' testimony was hearsay and inadmissible, and the trial court was not required to consider it merely because the prosecutor failed to raise an objection when the testimony was elicited.

We also reject defendant's argument that Schultz' testimony was admissible because it was not offered to prove the truth of the statement made by complainant's father, and consequently, it could not be characterized as hearsay evidence.

Hearsay evidence consists of testimony or written evidence presented in court of a statement made out of court which is offered to prove the truth of the matters contained in the out-of-court statement. *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738; *Hengels v. Gilski* (1984), 127 Ill. App. 3d 894, 469 N.E.2d 708.

In the instant case, Schultz testified that when complainant's father telephoned her in the evening of August 3, 1989, he said that he

suspected that complainant might have been abused and said "[w]e don't know about [complainant]."

On appeal, defendant asserts that Schultz' testimony was offered to establish the state of mind of the complainant's father at the time he telephoned Dr. Schultz. The evidence was, therefore, offered to prove that on the evening of August 3, 1989, complainant's father did not know whether complainant had been sexually abused. Consequently, we find this testimony was presented as an assertion of the truth of the matter contained in the out-of-court statement by complainant's father and was inadmissible hearsay. Accordingly, the trial court properly ruled that this testimony was to be excluded.

Finally, we consider defendant's claim that the trial court erred in denying defendant's motion *in limine* to exclude the testimony of the complainant's sister. Defendant contends that the trial court improperly admitted the testimony of M.M. to show a common scheme or design. We find this argument unpersuasive.

The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that determination may not be overturned on appeal absent a clear abuse of discretion. (*People v. Illgen* (1991), 145 Ill. 2d 353, 364, 583 N.E.2d 515; *People v. Franklin* (1990), 135 Ill. 2d 78, 96, 552 N.E.2d 743.) A clear abuse of discretion exists only where the trial court's decision is unreasonable or arbitrary. *Illgen*, 145 Ill. 2d at 364; *People v. M.D.* (1984), 101 Ill. 2d 73, 90, 461 N.E.2d 367.

Evidence of other offenses is not admissible for the purpose of showing the defendant's disposition or propensity to commit crime. (*Illgen*, 145 Ill. 2d at 364; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821.) Yet, evidence of other crimes is admissible when it is relevant to prove a fact in issue, defendant's motive, intent, identity, absence of mistake, or *modus operandi*. (*Illgen*, 145 Ill. 2d at 364-65; *McKibbins*, 96 Ill. 2d at 182.) Indeed, evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime. (*Illgen*, 145 Ill. 2d at 365; *McKibbins*, 96 Ill. 2d at 182; *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.) When evidence of other crimes is offered, the trial judge must weigh its probative value against its prejudicial effect and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. (*Illgen*, 145 Ill. 2d at 365; *People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840.) Evidence is considered "relevant" if it has any tendency to make the existence of any fact that is material to the determination of the case more or less

probable than it would be without the evidence. *Illgen*, 145 Ill. 2d at 365-66; *Stewart*, 105 Ill. 2d at 54.

Common design or scheme refers to a larger criminal scheme of which the crime charged is only a portion. (*People v. Tipton* (1990), 207 Ill. App. 3d 688, 566 N.E.2d 352; *People v. Partin* (1987), 156 Ill. App. 3d 365, 509 N.E.2d 662.) It has been held that the testimony of other victims of sexual abuse may properly be admitted where that evidence of other crimes establishes a common design or scheme by the defendant. See *People v. Moffat* (1990), 202 Ill. App. 3d 43, 57, 560 N.E.2d 352; *Partin*, 156 Ill. App. 3d at 371, 509 N.E.2d at 665.

Evidence of another offense may be used only when the other offense has some threshold similarity to the crime charged, and it is this similarity which increases the relevance of the evidence and ensures that it is not being used solely to establish the defendant's criminal propensities. (*Illgen*, 145 Ill. 2d at 372; *People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59.) Where evidence of prior bad acts is offered to prove *modus operandi* or that the crime charged was part of a common design or plan, there must be a high degree of similarity between the facts of the crime charged and the other offense in which the defendant was involved, and the two offenses must share such distinctive common features as to earmark both acts as the conduct of the same person. *Illgen*, 145 Ill. 2d at 372-73; *McKibbins*, 96 Ill. 2d at 185-86.

In the instant case, M.M. described conduct by defendant which was virtually identical to the incidents of abuse described by complainant. This testimony established that defendant had a common scheme or design to use "nicing" as a pretext to sexually abuse his stepdaughters. The testimony of M.M. was relevant and probative of the issue of defendant's guilt, and its probative value outweighed its prejudicial effect. Consequently, the trial court properly admitted the testimony of M.M., and defendant is not entitled to receive a new trial on this basis.

For the foregoing reasons, the judgments of the trial court are affirmed.

Affirmed.

McNAMARA and RAKOWSKI, JJ., concur.